May Term, 1859.

REED v. THE STATE.

An act of 1859 is entitled "An act to amend section eleven of an act entitled 'An act to establish Courts of Common Pleas, and defining the jurisdiction and duties of, and providing compensation for, the judges thereof,' approved May 14, 1852—so as to extend the jurisdiction of said Court in certain cases." *Held*, that the latter part of the title embraces § 2 of the act, extending or increasing the jurisdiction of the Court in criminal cases.

It is not necessary, under the constitution, that all matters properly connected with the principal subject-matter of a statute shall be expressed in its title.

Section 1 of the act above mentioned sets out and amends § 11 of the act of 1852, touching the civil jurisdiction of the Common Pleas, and § 2, extending the jurisdiction of the Court in criminal cases, is added. *Held*, that the subject-matter of the act of 1852 was the jurisdiction of the Court, and that of the act of 1859, was the increase of that jurisdiction; and hence, § 2 of the latter act is a part of the amendment of § 11 of the former act.

The mode of initiating and conducting prosecutions for criminal offenses must be uniform in the same Court, but it may be different in different Courts. Thus, in the Circuit Court, prosecutions for felonies are initiated by indictment; but under the act of 1859, they may be commenced in the Common Pleas by affidavit and information.

REED
v.
THE STATE.

| 12 | 641 |
| 137 | 561 |
| 12 | 641 |
| 148 | 350 |
| 12 | 641 |
| 153 | 615 |
| 12 | 641 |
| 156 | 699 |
| 12 | 641 |
| f157 | 235 |
| 12 | 641 |
| 162 | 204 |

APPEAL from the *Marion* Court of Common Pleas.

HANNA, J.—*Reed* was convicted of grand larceny. The only question in the case is, whether the Common Pleas Court had jurisdiction.

Wednesday, June 29.

It is conceded by the counsel for the defendant, that the legislature possesses the power to confer jurisdiction over such offenses. The question is, has it been exercised in a constitutional manner?

The act purporting to confer the jurisdiction, was passed at the last session of the General Assembly. Acts 1859, p. 94.

It is insisted that the title of the act is not broad, comprehensive, and at the same time specific, enough, to properly embrace within it the provision in question, keeping in view § 19 of art. 4 of the constitution, namely, "Every act shall embrace but one subject and matters properly connected therewith; which subject shall be expressed in the title," &c.

The title is as follows: "An act to amend section eleven of an act entitled 'An act to establish Courts of Common

Pleas, and defining the jurisdiction and duties of, and providing compensation for the judges thereof,' approved *May* 14, 1852—so as to extend the jurisdiction of said Court in certain cases."

Section 11 of the original act, to which the first part of this title refers, is the one conferring and defining the jurisdiction of that Court in civil cases. The first section of this amendatory act is relative to jurisdiction in civil cases, and it is argued that the whole subject properly embraced within the title, was, by that section, exhausted; that the second section, upon the subject of the jurisdiction of that Court over felonies, was not, therefore, legitimately placed in the bill, under that title.

We cannot concur in this view. We are of opinion that the latter part of the title, to-wit, "so as to extend the jurisdiction of said Court in certain cases," may, and does, embrace within its legitimate meaning, the extension or increase of the jurisdiction of the Court in criminal cases. If this is to be regarded as an original enactment, then, even if the subject is not embraced in the title, as a primary and substantive subject of the then action of the legislative body, it falls clearly within "matters properly connected therewith"—that is, with the subject which must be embraced in the title, namely, the jurisdiction of the Court. In other words, this fundamental provision does not require that all the "matters properly connected" with the principal subject-matter of such bill, shall be expressed in the title, but only that principal subject. Here the principal subject of the act in question, is in relation to the increase of the jurisdiction of the Court. *Gabbert* v. *The Jeffersonville Railroad Co.*, 11 Ind. R. 365.

It has been suggested, in consultation, that, in amendatory enactments, there can be but one legitimate purpose in view, under § 21 of the same art. of the constitution, and the law relative to amendments. Section 21 is, that " No act shall ever be revised or amended by mere reference to its title; but the act revised, or section amended, shall be set forth and published at full length."

In the case at bar, § 11 of the act of 1852 is the only

one set forth at full length, or, indeed, at all, in the subsequent statute. It is not, therefore, an attempt to revise the whole act of 1852. That section, as before stated, treats of the jurisdiction of the Court in civil cases only. Section 14 treats of, and confers jurisdiction in, all offenses which do not amount to felony.

The purpose which, it has been suggested, was in view by the adoption of the statute, under the title given it, could not have been other than to perfect the section named, upon the particular subject therein treated of, to-wit, civil jurisdiction in certain enumerated cases; that the section of the constitution (§ 19) which permits matters properly connected with the main subject of the enactment, to be embraced in the same bill with the main subject, can have reference only to enactments of an original, primary character, and not to such as profess to be, and are, of a mere amendatory character; that in the latter class of enactments there can be but one object in view, one subject embraced, and that is, in regard to the particular clause of the original act to which the title of the amendatory one refers; that when the amendatory enactment has fully treated of that particular clause, no other matter can be included in its provisions, as being properly connected therewith, even though it might be so included, if it was a bill of the original character above indicated.

There is much force in these suggestions, because of the great difficulty in tracing a precise line beyond which it would be an excess of power to go, and within which the legislative power may legally act. Although it is a salutary rule to construe a fundamental law strictly, yet if, in applying the usual rules of construction, doubt should still exist as to whether the enactment is in consonance with the fundamental law, we know of no safer guide than to let the coördinate branches of the government have the benefit of that doubt, and only declare an act unconstitutional by judicial decision, when it is manifestly so. Care should be taken that this construction, given by each of the departments of the government, within its legitimate sphere, to any particular clause of the constitution, should

have its due weight. The consideration that one department should give to the views of a coördinate department, in placing a construction upon a fundamental law, depends upon the particular subject of the clause under consideration in each particular case. So the weight that the judicial branch of the government should give to the opinion, as expressed by the acts of the legislative branch, should depend, somewhat, upon whether the clause under consideration was, or was not, a restriction upon that branch, in the exercise of its powers.

Keeping these things in view, we again recur to the suggestion upon the 21st section named, and inquire whether the additional jurisdiction extended to the Common Pleas Court by the act under consideration, can properly be included within the title, and be conferred under it.

To arrive at a correct solution of this inquiry, it is, perhaps, necessary to advert, for a moment, to the parliamentary law, upon the subject of amendments, as applied in legislation.

It is said in § 35 of Jefferson's Manual, that "Amendments may be made so as totally to alter the nature of the proposition; and it is a way of getting rid of a proposition, by making it bear a sense different from what was intended by the movers, so that they vote against it themselves. A new bill may be ingrafted, by way of amendment, on the words, 'Be it enacted,'" &c. See, also, 2 Hats. 110; 4 *id.* 84, 87. We have verified these references, and find they sustain the text of *Jefferson.*

In the convention which framed the constitution, it was stated by a leading member, upon the first day of the session, before the adoption of any rules by that body for its government, that "the *lex parliamentaria* was as much the law to govern every deliberative body in this country, until such body had adopted rules for its own government, as the common law was applicable to the government of proceedings of the Courts of law." Deb. vol. 1, p. 6. This proposition, so advanced, was acquiesced in by that body; and, on the same day, a resolution was adopted, "that a committee be appointed to report rules of order for the govern-

ment of the proceedings of this convention" (*Id.* p. 7); which report and rules we have carefully examined (pp. 34, 38, 57, 58, of the Journal); and although the time and manner of offering, and the mode of disposing of, amendments, is therein provided for, yet there is not any indication of what an amendment is, or what may be contained in such a proposition.

The journal of that convention shows that, in many instances, propositions by the way, and under the name, of amendments, were introduced, entertained, and acted upon, by that body, which were not directly relevant and germane to the subject-matter of the original proposition. Examples may be seen in almost every day's proceedings, of motions by way of amendment acted upon, to strike out, sometimes the whole, at other times a part, of a section, and which, although it might be upon the same general subject, yet would evidently lead to other results and conclusions.

It has been further suggested that although the authority in *Jefferson* was, and is, the parliamentary law, in *England,* and, at the time it was written, in this country, yet that there has grown up a different rule here; that an amendment cannot be different from the original proposition, and must be to perfect, alter, change, or modify that proposition. So far as there has been any change or departure from the rule laid down by *Jefferson,* it has grown out of the national or state legislative bodies in this country, having adopted and acted upon arbitrary rules upon that point. Whether, as avowed by a member, and silently conceded by the convention, the *lex parliamentaria* was in force here at the time of the sittings of that body, as contradistinguished from certain usages which had grown up in this country, under local rules upon the subject, we need not pause to inquire. The result arrived at, construing the term amendment by the one or the other of these rules, is, as to this enactment, the same.

The usage referred to has grown up under the following rule adopted by the House of Representatives of the *United States,* in 1822, and somewhat similar ones which had

May Term, 1859.

REED
v.
THE STATE.

existed from the time of the congress of the confederation, to-wit, "No motion or proposition, on a subject different from that under consideration, shall be admitted under color of amendment."

Similar rules are adopted and acted upon in many of the states.

Now, as to the application of the rule. In the 31st Congress, 1st Sess., Journ. of the House, p. 784, a bill was under consideration granting the right of way, and making a grant of lands to the state of *Michigan*, and it was held admissible to amend it by adding thereto a provision for a similar grant to other states for sundry railroads therein. So, upon a bill proposing to the state of *Texas* a definition of her boundaries, and the relinquishment by her of certain territory, &c., it was moved to amend by adding two new sections, providing territorial governments for *New Mexico* and *Utah*. Objection, that the amendment was not germane, held admissible by the speaker and sustained by the House.

So, in a late work, it is said that "A proposition may be amended, in parliamentary phraseology, not only by an alteration which carries out and effects the purpose of the mover, but also by one which entirely destroys that purpose, or which even makes the proposition express a sense the very reverse of that intended by the mover; and, in like manner, a motion, which proposes one kind of proceeding, may be turned into a motion for another of a wholly different kind by means of an amendment." Law and Pract. of Leg. Assemblies in the United States, by Cushing, ed. 1850, p. 516.

It is again objected that the division of the amendatory act into two paragraphs or sections, is evidence that two subject-matters are included in it; that as the title professes to amend but one section of the old law, that amendment must be contained, and be presumed to be so contained, in the section of the amendatory enactment within which the old law to be amended is set forth.

Upon the question of numbering and paragraphing, the authority last referred to is as follows: "The numbers pre-

fixed to the several sections, paragraphs, or resolutions,
which constitute a proposition, are merely marginal indica-
tions, and no part of the text of the proposition itself; and,
if necessary, they may be altered or regulated by the clerk,
without any vote or order of the House." *Id.* p. 533. See,
also, Journ. of the House of Rep. of the United States,
29th Congress, 1st Sess., p. 1029; Jeff. Man., p. 79.

We think, therefore, that, as before stated, the subject of
the eleventh section of the old statute was in relation to
the jurisdiction of the Court; and as the subject of the
statute under consideration was an increase of the juris-
diction of that Court, the whole of said act upon that sub-
ject was properly included under the title set forth; and
that the whole of the enactment, in that respect, is an
amendment of that section, expressed, it is true, in a very
inartificial, bungling, and awkward form, but conforming
substantially to the constitutional requirement.

The principal question in this case, arises under the 22d
and 23d sections of the 4th art. of the constitution, which,
so far as applicable, is as follows:

" Sec. 22. The General Assembly shall not pass local or
special laws in any of the following enumerated cases, that
is to say:   *   *   *   *   Regulating the practice in Courts
of justice.   *   *   *   *   *

" Sec. 23. In all the cases enumerated in the preceding
section, and in all other cases where a general law can be
made applicable, all laws shall be general, and of uniform
operation throughout the state."

By the act organizing Circuit Courts (2 R. S. p. 5), and
that in regard to the rules, practice, &c., in criminal cases
(*id.* 361), and also an act to limit the number of grand
jurors, &c., and defining their jurisdiction, &c. (*id.* 387),
exclusive jurisdiction over felonies, was vested in the grand
jury and Circuit Court. *Spencer* v. *The State*, 5 Ind. R. 41.

The mode of proceeding in prosecutions for felony, is
pointed out by the statutes above referred to. The grand
jury is selected and organized in a manner, if the statute
is observed, which shows that much caution and circum-
spection was thought necessary upon that point. That

May Term,
1859.

REED
v.
THE STATE.

body consists of twelve members; any nine are competent to find a bill; to make such a legal presentment of a charge of crime against an individual as will authorize the Court to which the bill is returned, namely, the Circuit Court, to place him upon his trial. This is, in that respect, a modification of the grand jury system as it existed at the time of the adoption of the new constitution. Previous to that time, at least twelve men on the grand jury, had to agree to the presentment of a bill, and the jury might consist of not less than twelve nor more than eighteen. No man could be "put to answer any criminal charge, but by presentment, indictment, or impeachment." Const. 1816, art. 1, § 12. Notwithstanding this provision, it is a part of the history of the state, and of the judicial proceedings therein, that, at the time our new constitution was adopted, the practice in our Courts in various localities of the state, in prosecutions for crimes and misdemeanors, had become as different as the views of the many communities into which citizens were divided, in consequence of their emigration from the several parts of this extended confederacy, might suggest was best for the welfare of those who inhabited each locality. It is well known, that in many of the circuits of the state, the judge thereof was at a loss, in each county, as to the local laws and regulations upon the subject of the practice of the law in such county. He would often be stopped in the midst of his charge to the grand jury, when commenting upon some offense against the law, and the rules of evidence, &c., that should be observed in their investigations thereof, by a suggestion that, by some local law, the grand jury had not jurisdiction over that offense. In another county he would meet with statutes, local to that county, by which certain days were set apart for forming and perfecting the pleadings, and others for the trial of causes of a civil nature.

It was to remedy these, and various evils of a kindred character, that the clause and sections under consideration were adopted.

It was not made a cause of complaint, under the clause of the constitution of 1816, that many offenders against

the statutes, guilty of misdemeanors, were, by such local and special laws, put upon their trial without indictment, in the Courts inferior to the Circuit Court. The great complaint and crying evil, was, that there was no uniformity, even in adjoining counties, upon the subject of the jurisdiction of the same Court over similar offenses, or in the mode of proceeding in civil cases, in the Courts of the same name, and really organized under the same law.

The constitution expressly provides that "the General Assembly may modify or abolish the grand jury system." § 17, art. 7. As we have seen, some modification of that system has been made; and it is not insisted but that it might be, by the legislature, entirely abolished.

But it is urged that, whilst that mode of presenting a man for trial remains the only mode of arriving at such a result in one Court of the state, no mode, essentially differing therefrom, can be established in another Court, having like jurisdiction of the same offenses, and both modes of procedure stand; that one or the other must fall; that the law must be uniform throughout the state.

This argument, carried to its legitimate conclusion, would require the same proceedings in all Courts having concurrent jurisdiction. For instance, there are some offenses treated as misdemeanors, by the statutes defining the offense and prescribing the punishment; and yet the Circuit, the Common Pleas, justices' and city Courts have concurrent jurisdiction conferred, to hear, try, and determine, &c. Under the practice which has obtained heretofore, one offender would be placed upon his trial in the first-named Court upon an indictment preferred by a grand jury; in the second, upon an information preferred by the district attorney, founded upon an affidavit; in the third, upon an affidavit alone, &c. So of the offense in the case at bar, if the defendant had been prosecuted in the Circuit Court therefor, twelve men would have passed upon the charge against him before he could have been placed upon his trial. Nine men would have agreed that he should be so placed. In the Common Pleas, an affidavit was filed by one person, and an information filed thereon

by another, as it was his official duty to do, the same as it is the official duty of a prosecuting attorney to prepare an indictment when directed to do so by the grand jury. It would appear from the statute (2 R. S. p. 364), that, upon a sufficient affidavit being filed, the duty of the district attorney is imperative—he must file an information; nor does there appear to be any discretion, whilst the case remains upon the docket, in the Court. The defendant must be placed upon his trial. Whether a man shall be placed upon his trial upon a charge involving his liberty, and, to a great extent, his character, even if acquitted, depends upon the will of his, oftentimes malicious, accuser. It is true, that if those who know of the commission of an offense, do not voluntarily come forward and file an affidavit, then it is provided (2 R. S. p. 385) that they may be brought before the Court, and sworn and examined touching such offense, and if a reasonable presumption of guilt appears, the Court shall order so much of the testimony as amounts to a charge, &c., to be reduced to writing, and subscribed, &c. Here appears to be some judicial discretion lodged in the Court, to determine whether the case presented is such as ought to be prosecuted. We suppose that, in any case, the Court may direct, and the attorney may enter a *nolle prosequi*, after the institution of the proceedings. But the difficulty is, that, under one system, there is a tribunal, the grand jury, standing between the accuser and the accused—between the offender and the offended law—whose consent must be legally obtained before the humblest man can be compelled to appear for trial. By the adoption of the other system, any man, however poor, or however innocent, may be placed upon his trial at the instigation of a single individual. In other words, all barriers between the accused and his triers are broken down. He is accused and placed upon his trial without the intervention of a grand jury, or the consent of an intermediate advisory tribunal, such as might have been erected, and even without the exercise of any discretionary power, by the officers representing the state. With the question of whether this was wise

or unwise legislation—whether it is calculated to protect the innocent, or more speedily and certainly bring to punishment the guilty—we have nothing to do; it is only for us to decide whether, in the two modes of proceeding, there is that uniformity required by the fundamental law of the land. We have no hesitation in saying that the two modes of prosecuting cannot be initiated and carried forward in the same Court. The practice must, at least, be uniform in the same Court in each county of the state. For instance, if a statute should be passed that either or both of the modes might be adopted in the Circuit Court, then the mode resorted to might very greatly depend upon the will of the officers of the Court. In one circuit they might choose to institute proceedings by indictment, and in an adjoining one by information. There would, then, be but little uniformity in the practice in the same Court all over the state.

But still, the question remains, is it within the province of the legislature to prescribe the one mode of proceeding in the Circuit Court, and the other in the Common Pleas, and a slightly different one before a justice, for the purpose of charging and placing upon trial a man guilty of an offense? Does this meet the requirements of the constitution, that the laws shall be general and of uniform operation throughout the state, upon the subject of regulating the practice in Courts of justice?

The judiciary should set out, in the examination of every statute, with the presumption that the acts of the two coördinate departments of the government have been within the powers conferred upon them. *Waldo v. Wallace*, at this term (1). Nevertheless, as, under our form of government, the legislature is the creature of the constitution, owes its existence to that instrument, derives its powers from it; that is, the voice of the people in their sovereign capacity, fixing the limits of the legislative power; and as the same instrument makes the highest judicial tribunal thereby created the ultimate resort to determine as to whether a statute is constitutional or not, that tribunal should not hesitate to so declare when a

May Term, 1859.

REED
v.
THE STATE.

proper case is presented and made out. In arriving at a conclusion upon such a question, the state of facts and circumstances existing at the time of the adoption of the fundamental law, and that caused its adoption, if such existed, should be examined; as well as what was done under the law immediately after its adoption. We have already referred to the facts falling under the first branch of this proposition; as to those falling under the second branch, we may refer to the fact that, by our statute books, it appears that, at the first session of our legislature, after the adoption of the constitution, and at every session since, now near eight years, there have been acts passed by that department of the government, and received the sanction of the executive department, that directly prescribed or indirectly involved this diversity of modes of practice, in criminal and civil cases, in the different Courts of the state. These laws have received the indirect sanction of the judicial department by the judicial administration of those laws by the several Courts of the state, although the question may not have been directly decided in any given case.

Indeed, soon after the adoption of the constitution, a statute very similar to the one under consideration, received the direct sanction of the legislative and executive branches of the government (2 R. S. p. 19), and the indirect approval of this Court. *Lindville* v. *The State*, 3 Ind. R. 580. It is true, that the law under which *Lindville* was prosecuted, was afterwards decided to be inoperative. *Spencer* v. *The State*, 5 Ind. R. 41. Yet it was not because it was unconstitutional, but for the reason that it was repealed by an act passed at the same session, but of a later date, and which was not in force at the time of the decision in the case in 3 Ind. R. The act under which *Lindville* was prosecuted, and which was very similar to the one of last winter, was put in force by an emergency clause. The one which repealed it by implication, was left to be put in force when regularly circulated. So that decision may be regarded as an indirect judicial construction of the provisions of the constitution now being con-

sidered. It is not direct, because the question was not made in that form; but one of the objections was, that "the proceeding by information is one unknown to and unauthorized by law." Under this objection, the reasons urged were other than that now being considered; yet we should regard the decision, to some extent, as an exposition of the views of the judiciary. The same constitutional clauses we are now considering were then in force, and although the question now urged was not then presented as a distinct proposition, we must presume that, if the law was so palpable a violation of those constitutional provisions as then understood, some notice would have been taken of the point. The inference would be that the infraction of the constitution was wholly overlooked, which is not probable, or else that the construction then given to that instrument, upon the point involved, was not the same as that now sought to be placed upon it by the defendant in the case at bar.

But, to take a more comprehensive view of the question, we do not well perceive how the advocates of a rigid application of the clauses upon the subject of an uniformity of laws throughout the state, to the modes of practice in different Courts, can stop at its application to cases alone where concurrent jurisdiction is given. If the view we have taken is incorrect, and laws "regulating the practice in Courts of justice" must be general and uniform as to the mode and manner of proceeding in the several Courts where there is concurrent jurisdiction, a like mode of reasoning would require that the same rule should be applied in all other cases.

In other words, felonies could not be prosecuted in the Circuit Court by one mode of procedure, and misdemeanors in the Common Pleas by another mode. This would involve the somewhat absurd conclusion, that the whole contemporary practice of the several departments of the government, in that respect, was wrong, and has continued wrong up to this time; and that the sense in which those portions of that instrument was then understood by persons acting in those departments, was an improper one.

May Term, 1859.

We are not prepared to so decide now, whatever we might have decided, if this had been, immediately upon the adoption of the constitution, presented to us, as a new and untried question, without the light of all this contemporaneous construction to steer by.

We are, therefore, of opinion that the judgment of the Common Pleas Court should be affirmed.

DAVISON, J., dissented.

*Per Curiam.*—The judgment is affirmed with costs.

*H. W. Ellsworth* and *S. A. Colley*, for the appellant.

*J. E. McDonald* and *A. L. Roache*, for the state.

