DRAPER *v.* ZEBEC ET AL.

[No. 27,511.   Filed December 9, 1941.   Rehearing denied January 21, 1942.]

*Henry G. Doherty* and *Willis C. McMahan,* both of Gary, for appellant.

*Walter Myers, Donald Smith,* and *Walter Myers, Jr.,* all of Indianapolis. *Crumpacker & Friedrich,* *Jay E. Darlington,* and *Bomberger, Peters & Morthland,* all of Hammond, for appellees.

Fansler, J.—This is an appeal from a judgment abating a proceeding supplemental to execution.

James Hansen, Receiver of Mid-City State Bank, recovered a judgment against the appellee Katherine Zebec. Execution issued, and afterward this action was brought by a complaint alleging that the defendant, Federal Life Insurance Company, is indebted to the judgment debtor in a sum exceeding the amount of the judgment and the amount allowed by law as exempt from execution, and that the judgment debtor has no other property subject to execution. The insurance company appeared and answered that it was not indebted to Katherine Zebec in any sum. Afterward the plaintiff filed a supplemental complaint, alleging that at the time of the filing of the original complaint there was pending in the United States District Court for the Northern District of Indiana an action by Katherine Zebec against the defendant insurance company, and that Katherine Zebec recovered therein a judgment in the sum of $26,026; that thereafter the judgment was assigned by Katherine Zebec to Minnie Lees and Zora Zebec; that the Federal Life Insurance Company, without the knowledge or consent of the plaintiff, and while the original complaint was pending, paid the judgment. There is prayer for an order against Katherine Zebec to appear and answer concerning the moneys paid her by the Federal Life Insurance Company, and that the company be ordered to appear and answer and pay the amount of the original judgment.

Afterward Katherine Zebec appeared and filed an answer in abatement based upon the ground that, by reason of the enactment of chapter 84, section 5, of the Acts of 1937, which provides that "no execution shall issue under this act upon any judgment upon a debt secured by mortgage upon real property," the right to

have the execution satisfied is extinguished. A demurrer to this answer was overruled, and the plaintiff replied in six paragraphs, all based upon the statute of 1937. There was a trial and judgment abating the action.

The plaintiff filed a motion for a new trial, pending the determination of which he filed his petition to have Floyd S. Draper substituted as party plaintiff. The petition alleges that on the 24th day of June, 1940, pursuant to authority granted by the Lake Superior Court, the plaintiff, as receiver, sold, assigned, transferred, and set over to Floyd S. Draper all of his right, title, and interest in the judgment which was the basis of the proceeding supplemental to execution, and it is recited that by reason of such authority Floyd S. Draper has become the real party in interest. The defendant Zebec objected to the substitution, which objection was overruled, and Floyd S. Draper was substituted as sole plaintiff. Thereafter the plaintiff's motion for a new trial was overruled. The defendant Zebec then filed her motion that the court take no further action in the cause upon the ground that "this cause of action became void on June 24, 1940, and the judgment sued on became void on the same date, when said cause of action and judgment were purchased from the original plaintiff by his attorney of record, Floyd S. Draper, during the pendency of the action. . . ." The plaintiff Draper tendered his affidavit in opposition to the motion, from which the following facts appear:

The plaintiff Draper was a member of the firm of Draper & Draper, attorneys, who represented Hansen, the receiver, at all times involved. The judgment against the defendant Zebec was recovered in May, 1932. In November, 1930, the defendant Zebec filed a suit in the Lake Superior Court against the Federal

Life Insurance Company, and the cause was afterward transferred to the United States District Court for the Northern District of Indiana. The proceeding supplementary to execution was filed in July, 1932. Shortly thereafter one of the attorneys for the defendant Zebec represented to the plaintiff's attorneys that in his judgment it would be injurious to the interests of Mrs. Zebec, in her action against the insurance company, if the proceeding supplemental to execution was pressed before the case against the insurance company was concluded, and suggested that if the latter case were permitted to continue pending on the docket until the determination of the action against the insurance company it would be agreed that no money recovered from the insurance company would be disbursed until the proceeding supplemental to execution had been determined. This suggestion and agreement were afterward incorporated into a letter directed to Draper & Draper. In the letter it was stated that one of the attorneys for the insurance company had agreed to stand by in the supplemental proceeding until the action in the federal court was settled. Prior to the judgment in the federal court, one of the attorneys for the insurance company promised the plaintiff Draper that no judgment obtained by Mrs. Zebec would be paid until and unless he, the attorney, first notified Mr. Draper. In April, 1935, Mrs. Zebec recovered a judgment against the insurance company for $26,026. There was an appeal and the judgment was affirmed in March, 1936. In February, 1936, Katherine Zebec assigned the judgment to Minnie Lees and Zora Zebec, her daughters. It is asserted that the assignment was made without the knowledge of Hansen, receiver, or his attorneys, and with the intention to defraud the receiver. On or about the 16th day

of October, 1936, the judgment was paid by the Federal Life Insurance Company, and the satisfaction was signed by Katherine Zebec, Minnie Lees, and Zora Zebec. On June 3, 1940, the receiver had liquidated the assets of his trust to the point where it was, in his opinion, advisable to sell the remaining assets, among which was the judgment against Mrs. Zebec, for cash. He filed his petition in the court administering the trust, and an order was made authorizing a sale. The receiver was unable to sell the judgment, and he then advised the firm of Draper & Draper that he believed they had not acted with due diligence in connection with the matter in that they had relied too greatly upon the written promises of other attorneys, and that as a result the judgment had not been collected, and that in his opinion said attorneys were morally, if not legally, obligated to purchase the judgment, and he suggested that the judgment be purchased by the attorneys for $1,000, the sum to be credited upon the attorneys' fees due in connection with their employment by the receiver. Floyd S. Draper offered the sum of $1,000 for the judgment, which was tentatively accepted. The receiver filed his petition in court for an order confirming the sale, which was approved, and a copy of the petition to the court for approval of the sale is set out as an exhibit. It appears in the petition that all of the facts were submitted to the supervising court, including the fact that there had been a judgment abating the proceeding supplemental to execution, and that a motion for a new trial was pending. The receiver also said in his petition for approval of the sale that he felt the attorneys were morally, if not legally, obligated to purchase the judgment. The sale was outright and unconditional. The petition was approved and the sale confirmed by the court. It is further made to appear from the plaintiff's

affidavit that no arrangement had been made between the plaintiff and Hansen, either individually or as receiver, to share the proceeds of the litigation; that it was not purchased for speculative or investment purposes, but purely for the purposes set out. The trial court denied the plaintiff the right to file this affidavit and showing, and thereupon sustained the motion of the defendant Zebec that no further action should be taken, and adjudged and decreed that the plaintiff Draper was not permitted to proceed further as a party in the cause.

Two questions are presented: Was the assignment of the judgment and cause of action to the appellant Draper champertous and therefore void? Did the statute relied upon by the appellees strike down the right of the judgment plaintiff to enforce the execution?

Professor Williston in his work on contracts says: "Maintenance consists in maintaining, supporting, or promoting the litigation of another. Champerty is a bargain to divide the proceeds of a litigation between the owner of the liquidated claim and the party supporting or enforcing the litigation." The author says that the technicality of the rules of the English common law "has led some courts to refuse to apply the common-law tests of champerty and maintenance, and to consider merely whether the particular bargain in question is oppressive to the client, vexatious to the defendant, or a misuse of the courts . . ." Williston on Contracts, Rev. Ed., Vol. 6, §§ 1711, 1712, pp. 4833, 4837, 4838.

Space does not permit of an analysis of the authorities dealing with the early common-law rules affecting maintenance and champertous contracts and of the gradual relaxing of safeguards which were thought necessary to protect the public interest

in respect to litigation. But it is clear from the authorities that everything declared against and every contract held void as champertous were in violation of a statute or thought to be against the public interest and against public policy, and that no contract was held void as champertous upon any other ground.

It is pointed out in *Stotsenburg, Adm'r,* v. *Marks, et al., Ex'rs* (1881), 79 Ind. 193, 196, that : "According to. Coke, 'nothing in action, entrie or re-entrie, can be granted over; for so under colour thereof pretended titles might be granted to great men, whereby right might be trodden down, and the weak oppressed.' Coke, Litt. 214 a. And in *Masters* v. *Miller,* 4 T. R. 320, Buller, J., says: 'It is laid down in our old books that for avoiding maintenance a chose in action can not be assigned,' but adds: 'The good sense of that rule seems to me to be very questionable; and in early as well as modern times it has been so explained away, that it remains at most only an objection to the form of the action *in any case.'*" It is further said that: "It is also a recognized rule in this State, that 'A conveyance of land, though by the rightful owner, while it is in the adverse possession of another claiming to be the owner thereof, is absolutely void as to the party in possession and his privies.'" In Blackstone's time it was thought that many, for the furtherance of pretended rights, conveyed some interest therein to great men in order to gain their support and influence over the courts in the interests of their cause, and this seems to have been the basis for the strict rules prohibiting the assignment and transfer of anything in controversy. But it is no longer considered that justice will be perverted by the assignment of things in action, and it is expressly permitted, and in *Fort Wayne, Muncie & Cincinnati R. R. Co. et al.* v. *Mellett* (1884),

92 Ind. 535, the rule against a conveyance of land in the possession of another is said to have been abrogated by § 3-1302, Burns' 1933, § 972, Baldwin's 1934, which provides that any one having the right to recover possession of real estate may maintain the action in his own name. It would seem that the court considered that the rule had been so explained away that it remained "at most only an objection to the form of the action in any case," and that the prohibition involved not a condemnation of the transfer of title, but only of maintaining an action upon it in the name of the assignee. We now have statutes expressly authorizing the assignment of judgments and providing for the issue of execution in the name of the original plaintiff, but for the use of the assignee, and providing that: "Any action which the plaintiff or complainant in such judgment or decree might have thereon may be maintained in the name of the assignee." § 2-2701—§ 2-2704, Burns' 1933, § 416—§ 419, Baldwin's 1934. It is clear then that many things anciently thought inimical to the public interest are no longer thought so, but are expressly permitted if not encouraged. It may not be concluded therefore that, because a certain contract would at one time have been considered void because champertous, an identical contract is void because champertous at a later date without ascertaining that the thing which was unlawful at the time of the first contract, and because of which the contract was declared void, is still unlawful at the time of the later contract. No case has come to our attention in which a contract has been declared void as champertous except upon the ground that it was in violation of some statute or of some rule then thought necessary to the public welfare. The things denounced as unlawful were uniformly supposed to have a tendency to pervert justice, encourage a misuse of the courts, to

be vexatious to defendants, or to make possible oppression of clients by their attorneys. In other words, each transaction was thought to be, in the words of Professor Williston, "oppressive to the client, vexatious to the defendant, or a misuse of the courts."

Champerty originally involved a bargain to divide the proceeds of litigation, but now it is generally held allowable for an attorney to contract for a contingent fee based upon the amount of recovery.

It is sometimes said that it is champertous to contract for a percentage of the amount to be recovered, but that it is not champertous to contract for an amount equal to a given percentage of the amount recovered, which seems to involve a distinction without a difference. In *Sedgwick* v. *Stanton* (1856), 14 N. Y. 289, 296, 301, it was concluded that: ". . . in this country, and especially in this state, the whole law of maintenance, except so far as it is embodied in our statutes has been repeatedly regarded by the courts as inapplicable to the present condition of society, and substantially obsolete. . . . that not a vestige of the law of maintenance, including that of champerty, now remains in this state, except what is contained in the Revised Statutes." And in *Stotsenburg, Adm'r,* v. *Marks et al., Ex'rs, supra,* this court said (page 197 of 79 Ind.) : ". . . how far the subject may be affected by the Code, and the legislation of the State since 1852, it is not necessary now to consider."

In *West* v. *Raymond et al.* (1863), 21 Ind. 305, 306, 307, this court considered a transaction involving the purchase of real estate by an attorney from his client pending an action to quiet title. The court seemed to doubt whether such a transaction would be champertous if it involved a third person who was not the attorney for the owner. It is said: "We take it

to be settled in this State that a contract between an attorney and client, by which the attorney is to have all or a part of the subject matter of the litigation, is void." *Scobey* v. *Ross* (1859), 13 Ind. 117, is cited as supporting this view, but that case dealt with a contract by which an attorney was to receive a *part* of the thing to be recovered, whereas in the West case there was an outright sale. It is noted that the action was to recover possession of real estate, which presumably was in the possession of another, and to quiet title thereto as against the claims of one in possession, and at the time such sales were void (or at least could not be enforced in the name of the assignee). The opinion seems to have been influenced by a statement by Lord Campbell in *Simpson et al.* v. *Lamb* (1857), 40 Eng. Law & Equity Reps. 59, in which it is said that it is against the policy of the law to permit such dealings by an attorney before judgment. But it is disclosed by an examination of the case that Lord Campbell's first impression was that the contract would only be questioned in an action between the parties to it. Whatever the rule in England may have been at that time, it seems that it is the rule in Indiana, as suggested in *Allen et al.* v. *Frazee* (1882), 85 Ind. 283, and decided in *Hart et al.* v. *State ex rel. Rock* (1889), 120 Ind. 83, 21 N. E. 654, 24 N. E. 151, that a champertous contract is only void as between the parties to the contract. The latter case involved an assignment of claims against a contractor under an agreement that they were to be prosecuted, and the assignor and assignee were to share in the proceeds of the litigation, and both cases are cited with approval in *Zeigler, Ex'tr,* v. *Mize* (1892), 132 Ind. 403, 31 N. E. 945. In *Whinery* v. *Brown* (1905), 36 Ind. App. 276, 281, 282, 75 N. E. 605, 607, the cases are reviewed, and it is said: "Champertous agree-

ments can not be enforced in this State, but the rule declared in *Scobey* v. *Ross* (1859), 13 Ind. 117, has been restricted and modified. . . . While the propriety of contracts for contingent fees has been vehemently debated, yet, when such contracts are fairly made between counsel and clients, made in good faith and free from fraud or imposition, they are not illegal, and are as obligatory as between other parties. It may and does happen that persons who have rights, but no means to pursue them, are obliged to resort to this means of procuring legal redress. And it is the duty of the courts carefully to scrutinize such contracts to see that no improper advantage is taken either of the ignorance or necessity of those who enter into them, and if it appears that they are obtained by any undue influence of the attorney over the client, or by fraud or imposition, or that the compensation is clearly excessive, the party aggrieved will be protected. The fact that the practice of stipulating beforehand for professional fees, contingent on the result of the litigation, is sometimes abused, and exposes the profession to misapprehension and illiberal remark, is not sufficient excuse for refusing to enforce such a contract, when characterized throughout by 'all good fidelity to the client.' " Numerous authorities are cited to support the statement. The action was between the parties to the contract to recover under the contract. In *Lind v. Douglass* (1925), 83 Ind. App. 380, 384, 148 N. E. 497, 498, it is said: "A 'layman' is no more privileged to 'buy a lawsuit' than is a lawyer; the law frowns upon the contract, not simply upon the purchaser only, and a contract which is champertous and, therefore, void will not be enforced no matter who the purchaser may be. . . . If she had a right to make the sale, we know of no rule of law that would exclude the attorney of the party

from making a contract with his client and thus becoming the purchaser. There might, in such a case arise, as between the said attorney and his client, some question as to whether the attorney had acted fairly with his client in the said transaction and the voidability of the transaction be thus, as between the parties, brought in question, but this would be a matter of no concern to third persons." This statement of the rule is consistent with reason and sound principle.

If an attorney buys real estate or a chose in action from his client, the transaction is not *per se* oppressive. In Lord Campbell's case the attorney purchased the judgment from his client for the full amount thereof because his client needed money immediately, but it seems that at that time certain fees accrued to the attorney for the plaintiff which might be charged as costs against the defendant, and it seems to have been thought oppressive of defendants to permit an attorney to purchase a right of action from his client in order to obtain fees and charges from the defendant, but no such practice exists in this State, and there is no reason to fear oppression of a defendant because of a transaction between a plaintiff and his attorney. See *Rogers* v. *Hendrick* (1912), 85 Conn. 260, 82 A. 586. It seems therefore that the reason for the extreme rule announced in Lord Campbell's case no longer exists, and the rule in its extremity must fail with the falling of the reason for it. The rule announced in the last two cases quoted amply suffices to protect against misuse of the courts and oppression of the parties. It therefore fulfills the purposes of the law concerning maintenance and champerty.

We are not unmindful of the fact that the judgment, which was the subject of the contract between attorney

and client in this case, amounted to several thousand dollars, and that it was purchased for $1,000, and that, if successful in collecting, the purchasing attorney will profit largely from the transaction, and that such transactions must be open to careful scrutiny by the courts. But the contract was not made by a private litigant and his attorney. The property was in *custodia legis,* the judgment was procured by a receiver, the agent of the court administering a trust, and the sale, before consummation, was submitted to the administering court for approval and confirmation. It is difficult to see how it can be said that under such circumstances the attorney was in more advantageous position to negotiate than his client, or why the fairness of the contract should be submitted to still another court for examination and approval before it is valid. Under the rule announced in *Hart et al.* v. *State ex rel. Rock, supra,* a judgment defendant may not defend against the enforcement of a valid and just judgment upon the ground that the attorney who purchased it, and to whom it was assigned, acquired it from his client. If there was any unfairness between the attorney and client it has worked no injury to the judgment defendant.

Chapter 84 of the Acts of 1937, upon which the appellees rely to defeat the appellant's action, is entitled "An Act to amend sections 592, 593, 596 and 598 of an act entitled 'An act concerning proceedings in civil cases,' approved April 7, 1881." The act of 1881 (Acts 1881, ch. 38, p. 240) is the Civil Code. It contains 867 sections and covers 151 printed pages in the official published Acts. It deals with practically every phase of civil procedure. The four sections sought to be amended deal with proceedings supplemental to execution only and are four of eight sections

dealing with that subject. The sections as amended by the act of 1937 deal with the same subject, except that by "Sec. 5 (a)," which is separated from section 4, which amends section 598 of the act of 1881, and which is a separate section not specifically amending any of the sections included in the title of the act of 1937, it is provided: "Sec. 5. (a) Except in such cases where the denial of this remedy would be a violation of the Constitution of the State of Indiana or the United States of America, no execution shall issue under this act upon any judgment upon a debt secured by mortgage upon real property, nor upon any judgment upon any contract of the sale of personal property unless the title to the said property passes at the time of said sale." This section 5 does not deal with proceedings supplemental to execution, but seeks to expressly change the law providing for the issue of execution, and to curtail and limit the cases in which executions shall issue. It, in effect, exempts all property from execution upon money judgments upon debts secured by mortgage or contract of sale of personal property except the property mortgaged or sold. This provision is not amendatory of any of the provisions of the sections of the statute of 1881 referred to in the title of the act of 1937, but if effective it does amend or partially repeal certain other unnamed sections of the act of 1881, and changes and modifies the law concerning the issuing of executions and the satisfaction of money judgments, and the exemption of property from execution. Section 19 of Article 4 of the Constitution of Indiana provides: "Every act shall embrace but one subject and matters properly connected therewith; which subject shall be expressed in the title. But if any subject shall be embraced in an act, which shall not be expressed in the title, such act shall be void only as to so much thereof

as shall not be expressed in the title." The purpose of this provision is to prevent surprise or fraud by including in the body of the act matter of which the title gives no indication, and to apprise the members of the law making body and the public of the subject of the legislation under consideration, and the title of an act sufficiently expresses the subject if it gives such notice as to reasonably lead interested persons to inquire into the body of the act. *Kleihege* v. *State* (1934), 206 Ind. 206, 188 N. E. 786; *Ule* v. *State* (1935), 208 Ind. 255, 194 N. E. 140, 101 A. L. R. 903; *Lutz, Atty. Gen., et al.* v. *Arnold et al.* (1935), 208 Ind 480, 193 N. E. 840, 196 N. E. 702; *Albert et al.* v. *Milk Control Board* (1936), 210 Ind. 283, 200 N. E. 688; *City of Gary* v. *Cosgrove et al.* (1937), 211 Ind. 294, 6 N. E. (2d) 940; *Marion School Tp.* v. *Smith* (1939), 215 Ind. 586, 21 N. E. (2d) 412. If the title to the act of 1937 had indicated that it was an act to amend "An act concerning proceedings in civil cases, approved April 7, 1881," it would be sufficiently broad to cover any provision amending any part of the act of 1881, but the title is limited to an amendment of four specific sections, all dealing with the specific subject of proceedings supplemental to execution. An examination of the title would not reasonably apprise one who has, or is about to take, a money judgment on a note secured by mortgage that he may no longer have execution against the real or personal property of the judgment defendant other than the property covered by the mortgage. Section 21 of Article 4 of the Constitution provides: "No act shall ever be revised or amended by mere reference to its title; but the act revised, or section amended, shall be set forth and published at full length." Under this provision two things are requisite: (1) That the title of the act amended must be set out in the title of the

amending act; and (2) that the section as amended must be set forth at full length in the amending act. *Mankin* v. *Pennsylvania Co.* (1903), 160 Ind. 447, 67 N. E. 229; *Hendershot* v. *State ex rel. Bennett* (1904), 162 Ind. 69, 69 N. E. 679. A new general law may be passed specifically and fully covering the subject-matter embraced in an existing general law, and thus the first law may be repealed or amended by implication, but the title of the new law must disclose that it covers the subject-matter of the existing law. An act, the title to which indicates that it is not a new general law, but designed only to amend and modify certain specified sections of an existing law, cannot be treated as amending or repealing other unspecified sections or other laws by implication, nor can it be treated as amending sections of the law involved which are not referred to in the title, nor as amending sections which are referred to in the title unless a new section which is to replace the old is set out at full length in the amending law. "Sec. 5 (a)" of the act of 1937 deals with executions and is designed to limit the cases in which they shall issue. Section 4, which precedes it, amends section 598 of the act of 1881, and deals with orders which may be made by the court upon the hearing in a proceeding supplemental to execution. The appellees say in their brief: "Since execution is the very *foundation* of supplemental proceedings, the abolition of execution 'under this Act' is equivalent to saying that supplemental proceeding is abolished so far as it relates to debts secured by mortgage." But if section 5 is effective at all, it abolishes not only supplemental proceedings, but also the issuing of execution in cases where supplemental proceedings are not resorted to. If section 5 sought only to abolish the remedy afforded by proceedings supplemental to execution in cases involving a debt

secured by a mortgage, or involving a contract for a sale of personal property, we should have a different question. As pointed out above, other sections of the Civil Code of 1881 provide for the issue of executions upon all money judgments. These sections could only be amended under the Constitution by an amendatory act in which the sections as amended are set out in full. This was not done. The sections were therefore not amended. The act of 1937 does not purport to be a general law superseding other laws and thus amending or repealing by implication. The subject-matter of section 5 is so incongruous with, and so slightly related to, the subject-matter of section 598 as originally enacted, or as amended, that we are forced to the conclusion suggested by both appellant and appellees that section 5 was intended not as an amendment to the procedure in proceedings supplemental to execution, but as an independent provision preventing execution from issuing in any case upon judgments upon a debt secured by mortgage or upon a contract for the sale of personal property. Since the act, in so far as section 5 is concerned, does not conform to the constitutional provisions above referred to, it is void. See 59 C. J. (Statutes) § 400, p. 819, and cases cited.

The court erred in overruling the demurrer to the answer in abatement. The court erred in sustaining appellee Zebec's motion to take no further action in the cause and entering judgment that the appellant should proceed no further as a party to the cause.

Judgment reversed, with instructions to sustain the demurrer to the answer in abatement, and for further proceedings not inconsistent with this opinion.

· NOTE.—Reported in 37 N. E. (2d) 952.

ON PETITION FOR REHEARING.

FANSLER, J.—The appellee Katherine Zebec has filed a petition for rehearing in which it is asserted that: "The decision contravenes two earlier Supreme Court decisions regarding title of statutes," and it is suggested that, if the opinion is to stand, *Lewis* v. *State* (1897), 148 Ind. 346, 47 N. E. 675, and *Stiers et al.* v. *Mundy et al.* (1910), 174 Ind. 651, 92 N. E. 374, should be overruled. These cases were first called to the court's attention in the brief on petition for rehearing. It is conceded that the opinion is sustained by the weight of authority, but it is contended that a contrary rule is established by the decisions of this court.

It is clear that the subject-matter of an amending act may be as broad as the title of the act which is amended *unless the title of the amending act restricts the subject-matter to a narrower field.*

In the Lewis case the court considered an act entitled, " 'An act to amend section 209 of an act entitled, "An act concerning public offenses and their punishment," . . .' " (Page 348 of 148 Ind., page 676 of 47 N. E.) The amending act contained two sections. The court held that the subject-matter of both sections of the amending act was within the purview of the subject of section 209, which was amended, and that the act would not be stricken down because the amending act was in two sections. The appellee is in error in assuming that the original opinion holds the act to be unconstitutional because of the division into additional sections.

The result reached in the Stiers case rests upon the conclusion that (page 654 of 174 Ind., page 376 of 92 N. E.): "Under the decisions of this court the mere fact that the proviso of the amendatory act of 1901, *supra,* refers to matters not germane to the subject-

matter of the particular section it purports to amend does not render it unconstitutional and void, if the subject-matter incorporated in the amendment is within the purview and is germane to the title of the act amended. *Lewis* v. *State* (1897), 148 Ind. 346, and cases cited; *Rose* v. *State* (1909), 171 Ind. 662, and cases cited; *Cain* v. *Allen* (1907), 168 Ind. 8, 24." The court seems to have assumed that the rule announced was established and settled by the cases cited, since there is no analysis or discussion of the principles involved.

In *Cain* v. *Allen et al.* (168 Ind. 8, 79 N. E. 201, 896) the court held that an amended section 9 was within the title of the original act. From the statements in the opinion and the authorities cited, it seems clear that no question was raised upon the sufficiency of the title of the amending act.

In *Rose et al.* v. *State* (page 665 of 171 Ind., page 104 of 87 N. E.), it is said: "The subject of the act of 1907, *supra,* is that of the act of 1875 (Acts 1875 [s. s.], p. 55), of which it is an amendment. . . ." An examination of the briefs in the case discloses that no question was made concerning the title of the amending act. The only contention was that the act dealt with two non-related subjects.

As we have already pointed out, the sufficiency of the title of the amending act was not involved in *Lewis* v. *State*. It is clear therefore that the statement quoted from the Stiers case is not supported by the authorities cited. We have investigated the cases to discover whether it finds support elsewhere in the decisions of this court.

*Reed* v. *State* (1859), 12 Ind. 641, 642, involved an act entitled, " 'An act to amend section eleven of an

act entitled "An act to establish Courts of Common Pleas, and defining the jurisdiction and duties of, and providing compensation for the judges thereof," approved May 14, 1852—so as to extend the jurisdiction of said Court in certain cases.' " Section 11 of the original act defined the jurisdiction of the court in civil cases. The first section of the amendatory act relates to jurisdiction in civil cases, and the second section of the amendatory act relates to jurisdiction in criminal cases. It is clear beyond controversy that both civil and criminal jurisdiction were within the title of the original act, and within the last part of the title of the amendatory act "so as to extend the jurisdiction of said Court in certain cases." In the discussion the court concerned itself only with the question of whether or not criminal jurisdiction came within the purview of section 11 of the original act. There would have been no concern with this question unless the amending act, having provided that its purpose was to amend section 11 only, must be limited in its operation to the purview of section 11. The court said (page 647 of 12 Ind.) : "We think, therefore, that, as before stated, the subject of the eleventh section of the old statute was in relation to the jurisdiction of the Court; and as the subject of the statute under consideration was an increase of the jurisdiction of that Court, the whole of said act upon that subject was properly included under the title set forth; and that the whole of the enactment, in that respect, is an amendment of that section, expressed, it is true, in a very inartificial, bungling, and awkward form, but conforming substantially to the constitutional requirement." The last clause of the quotation refers to the amending statute containing two sections, whereas it purported to amend but one section of the

original law. The court concluded that this was of no consequence so long as the subject-matter of both sections of the amending statute was within the purview of the section indicated for amendment in the title.

*State* v. *Bowers* (1860), 14 Ind. 195, involved an amendatory act, the title of which seems to have been broader than the title of the original act. It was said that the subject of the original act was licenses. It was held that a provision for licensing concerts was not within the title of the original act. The title of the amendatory act was broader, but it was said (page 198 of 14 Ind.) : "For the purposes of this case, the amendatory act may be considered as entitled an act merely to amend the former act, without in any manner indicating the nature of the amendment." This is clearly true in any case where the title of the amending act is broader than the title of the original act. The case is far from a holding that a title of an amendatory act, indicating a restricted field inclosing less than the entire subject of the original act, will permit of an amendment outside the restricted field. It is said, concerning *Reed* v. *State,* that it (page 198 of 14 Ind.) "goes as far as any decided case in sustaining legislation."

In *Brandon* v. *State* (1861), 16 Ind. 197, it is said: "If the title of the original act is sufficient to embrace the provision in question, it is unnecessary to inquire whether the title of the amendatory act would, of itself, be sufficient." *State* v. *Bowers* is cited as authority. The statement was correct when applied to the facts in the Bowers case, where the title of the amendatory act was treated as broader than the title of the original act. In the Brandon case the only question considered was whether or not a provision for courts was within the scope of the title of the original act, which provided for

the formation of new counties, and no question of the new matter being within the scope of section one of the original act was considered.

From the earliest times it has been uniformly held that an act of the Legislature which attempts to amend a section of a statute which has already been amended is unconstitutional and void, notwithstanding the title of the amendatory act sets out in full the title of the act sought to be amended. See *Feibleman* v. *State ex rel. Brown, etc.* (1884), 98 Ind. 516, and cases cited, and *Boring, Auditor,* v. *State ex rel. Jackson* (1895), 141 Ind. 640, 41 N. E. 270. This rule is entirely inconsistent with the contention that the amending act is valid if its subject-matter is within the title of the act sought to be amended, but it is consistent with the rule that the subject-matter of the amending act must be within the purview of the section which the title indicates as the part of the original act to be amended.

The case of *Reed* v. *State* is well considered and clearly indicates the conclusion of the court that the subject-matter of the amendatory act must come within the purview of the section of the original act indicated for amendment in the title of the amendatory act. Some of the language in *State* v. *Bowers* and *Brandon* v. *State,* standing alone, may seem to announce a rule inconsistent with *Reed* v. *State,* but, in so far as the language is inconsistent, it is *obiter dictum.* When the facts and questions presented are considered, the decisions in the latter two cases are not inconsistent with the earlier case. A careful examination of the Stiers case convinces that the court's attention was not called to *Reed* v. *State.* The rule announced is assumed to be established. *Reed* v. *State* is not overruled, nor is there any

indication that the court was conscious of a conflict with this early case.

In *Board of Com'rs of Allen County* v. *Trautman* (1933), 204 Ind. 362, 368, 184 N. E. 178, 181, this court considered an act entitled, "An Act to amend section 138" of an existing statute. The appellant contended that, although the title of the amendatory act expressed an intention to amend section 138 only, the act in fact amended both sections 136 and 138, and that it therefore contravened Section 21 of Article 4 of the Constitution. The court said: "If appellant's premises are correct, this case must necessarily be reversed." The court's conclusion could only have been arrived at upon the theory that an amendatory act, the title of which indicates a certain section of a law as the subject of amendment, must be limited in its operation to matters within the purview of that section.

It appears that the rule announced in *Stiers et al.* v. *Mundy et al., supra,* is inconsistent with and conflicts with the rule announced upon the same subject in the early Reed case and in the late Trautman case; that it is inconsistent with principles which have always and consistently controlled the decisions of this court in respect to legislative enactments, and that it is against the great weight of authority elsewhere. The statements in the other cases, which seem consistent with the rule laid down in the Stiers case, are too broad as general statements of the law, and should be treated as precedents only in cases where the factual situation is the same. *Stiers et al.* v. *Mundy et al.,* in so far as it conflicts with the rule laid down in the principal opinion, is overruled.

Petition for rehearing denied.

NOTE.—Reported in 38 N. E. (2d) 995.