335 N.E.2d 210 (1975)
In the matter of Daniel C. Kuzman.
No. 1173S230.
Supreme Court of Indiana.
October 16, 1975.
*211 Myron J. Hack, South Bend, Richard L. Gilliom, Stewart, Irwin, Gilliom, Fuller & Meyer, Indianapolis, John Kappos, Marlatt, Kappos & Gavit, Merrillville, for respondent.
Richard H. Grabham, Executive Secretary, Indianapolis, for Indiana Supreme Court Disciplinary Commission.
HUNTER, Justice.
This disciplinary action was commenced by the Disciplinary Commission in November, 1973. A hearing was held in October, 1974. Upon consideration of the hearing officer's findings and recommendations, respondent's petition for review and memorandum in support, the Disciplinary Commission's reply, and the record in this matter, we believe further proceedings are unnecessary.
Respondent was admitted to the Indiana bar in 1959, and has established a reputation as a competent and ethical attorney. Nevertheless, certain aspects of respondent's professional relationship with his client, Nellie Speece, fell below the minimum standards of professional conduct.

I.
Soon after respondent was employed by Mrs. Speece, she asked him to become a joint tenant with her in a savings account with rights of survivorship. Respondent consented to these arrangements as an accommodation to his client who, because of her disability, was not always able to do her own banking. Respondent further stated that she did not trust her household help and suspected them of informing her former husband about her business affairs and that the respondent was the only person she felt she could trust. The hearing officer found that respondent never deposited any monies in the account, never made any withdrawals from it and never saw or had possession of the passbook. In addition, respondent testified that it was a common practice for him and other Lake County, Indiana, lawyers to become joint tenants in bank accounts of clients as an accommodation, at the client's request, so that, for example, emergency funds could be transmitted to a client traveling in Europe.
While respondent's accommodation of his client was for valid business purposes, nevertheless, the method of accommodation selected was one which placed respondent in a position to inherit ownership of the account. As stated in State v. Horan (1963), 21 Wis.2d 66, 72-75, 123 N.W. 2d 488, 491:
"An attorney's duty of fidelity to his client involves more than refraining from exercising undue influence. A client has a right to full and disinterested advice."
It is not unusual for a client untrained in the laws to come into an attorney's office and state that he wants the attorney to form a corporation for him. If the attorney accedes and completes the forms without first exploring the sole proprietorship and partnership forms of business with the client, and the tax aspects of each, the attorney has failed to give the client the full and disinterested advice to which he was entitled, and which the bar demands be given.
"The practice of the law is not a business but a profession  a form of public trust, the performance of which is entrusted only to those who can qualify by *212 fitness, not the least of which is good moral character. While within his power, an attorney has no right to jeopardize the performance of his duties or the confidence, approval and esteem of the public which the legal profession has traditionally enjoyed. An attorney has a duty not to harm but to maintain the integrity of the legal profession even though this may call for a personal sacrifice or the omission of acts which are not intrinsically bad."
State v. Horan, supra, 21 Wis.2d 66, 70, 123 N.W.2d 488, 489-90. Similarly, when Mrs. Speece informed respondent of her reasons for creating the joint tenancy, it was incumbent upon him to explain to her the other legal arrangements for achieving her goals  arrangements which would not have at the same time given respondent a personal stake in the funds.
In reaching this conclusion, we reject respondent's contention that "any surface impropriety one might read into respondent's conduct was fully justified by his client's extreme circumstances." The rationale that the ends justify the means has no place in the legal profession.
It was charged that respondent's conduct in this matter breached Canons 11, 29, and 32 of the Canons of Professional Ethics of the American Bar Association.[1] While the Canons do not have the authority of Indiana statutes or case law, they evidence proper standards of conduct for the legal profession, Tokash v. State (1953), 232 Ind. 668, 115 N.E.2d 745. Canon 11 provides:
"The lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client.
"Money of the client or collected for the client or other trust property coming into the possession of the lawyer should be reported and accounted for promptly, and should not under any circumstances be commingled with his own or be used by him."
Canon 29 provides:
"Lawyers should expose without fear or favor before the proper tribunals corrupt or dishonest conduct in the profession, and should accept without hesitation employment against a member of the Bar who has wronged his client. The counsel upon the trial of a cause in which perjury has been committed owe it to the profession and to the public to bring the matter to the knowledge of the prosecuting authorities. The lawyer should aid in guarding the Bar against the admission to the profession of candidates unfit or unqualified because deficient in either moral character or education. He should strive at all times to uphold the honor and to maintain the dignity of the profession and to improve not only the law but the administration of justice."
Canon 32 provides:
"No client, corporate or individual, however powerful, nor any cause, civil or political, however, important, is entitled to receive nor should any lawyer render any service or advice involving disloyalty to the law whose ministers we are, or disrespect of the judicial office, which we are bound to uphold, or corruption of any person or persons exercising a public office or private trust, or deception or betrayal of the public. When rendering any such improper service or advice, the lawyer invites and merits stern and just condemnation. Correspondingly, he advances the honor of his profession and *213 the best interests of his client when he renders service or gives advice tending to impress upon the client and his undertaking exact compliance with the strictest principles of moral law. He must also observe and advise his client to observe the statute law, though until a statute shall have been construed and interpreted by competent adjudication, he is free and is entitled to advise as to its validity and as to what he conscientiously believes to be its just meaning and extent. But above all a lawyer will find his highest honor in a deserved reputation for fidelity to private trust and to public duty, as an honest man and as a patriotic and loyal citizen. [Emphasis added.]
Since there is involved here no misdealing in client's funds, we find no violation by respondent of Canon 11. Nor do we find that respondent's conduct violates Canon 29. However, we believe respondent's conduct transgressed the boundaries of Canon 32. An attorney should consent to the arrangement here entered, if at all, only after fully advising his client of effect thereof and of the alternative means of achieving the desired business flexibility.
"This may impose some hardship or inconvenience upon attorneys but personal sacrifices are inherent in the practice of law which he agreed to assume when he took the oath of office as an attorney. The entrusted privilege to practice law carries correlative duties and responsibilities to the court, the client, fellow lawyers, and the public. In each case there is perhaps a question of assaying the circumstances and making the choice but the attorney chooses at his peril."
State v. Horan, supra, 21 Wis.2d 66, 75, 123 N.W.2d 488, 492.

II.
When respondent undertook the representation of Nellie Speece, she was an apoplectic, sexagenarian divorcee with numerous legal problems, little cash and a lot of land. For a cash retainer of $1,000 and a 20% interest in her real estate, respondent promised to do all her legal work and to "stick by her." The real estate, worth approximately $250,000 to $1,000,000 was subject to claims of her ex-husband. To generate a cash flow for Mrs. Speece, respondent set up a corporation. Mrs. Speece conveyed her interest in the real estate to the corporation and received back shares of stock. The stock was then pledged as collateral for cash loans.
Respondent's ownership of an interest in Mrs. Speece's real estate was evidenced initially by Article VI of the corporate charter which provided:
"Terms of Capital Stock The Corporation will commence business by issuing one thousand (1000) shares of common stock having no par value which shall be entirely issued to the first Board of Directors consisting of Nellie Speece, Raymond Popyk, and Daniel C. Kuzman. Such shares shall be issued to said individuals for services heretofore rendered and said shares shall be considered paid in full and that said individuals shall not be further liable for any further payment thereon."
The extent of respondent's interest in this real estate was subsequently stated to be 200 shares (20%) of the corporation, such statement being contained in the Subchapter S election form. Additional representations of respondent's ownership of these shares appeared in his personal income tax return, the corporate tax return, and in a letter written by respondent to a bank seeking a loan for Mrs. Speece.
In September, 1970, Mrs. Speece's ex-husband commenced a guardianship proceeding in her behalf, and, thereafter, respondent disclaimed any ownership of the shares of stock. Amended tax returns were filed, listing Mrs. Speece as the sole shareholder. Respondent retracted his earlier *214 representation of ownership which had been made to the bank.
It was charged that respondent's receipt of 200 shares of Mrs. Speece's corporation, such shares being valued at approximately $150,000 to $200,000, in lieu of payment of attorney fees, was an agreement for excessive fees and violative of Canons 29 and 32, supra. Respondent was also charged with breaching the same Canons by virtue of the inconsistent statements he made regarding his ownership of the 200 shares, some of the statements being under oath.
In Draper v. Zebec (1941), 219 Ind. 362, 376, 37 N.E.2d 952, 957-58, we find the following statement quoted with approval from Whinery v. Brown (1905), 36 Ind. App. 276, 75 N.E. 605:
"While the propriety of contracts for contingent fees has been vehemently debated, yet, when such contracts are fairly made between counsel and clients, made in good faith, and free from fraud or imposition, they are not illegal, and are as obligatory as between other parties. It may and does happen that persons who have rights, but no means to pursue them, are obliged to resort to this means of procuring legal redress. And it is the duty of the courts carefully to scrutinize such contracts to see that no improper advantage is taken either of the ignorance or necessity of those who enter into them, and if it appears that they are obtained by any undue influence of the attorney over the client, or by fraud or imposition, or that the compensation is clearly excessive, the party aggrieved will be protected. The fact that the practice of stipulating beforehand for professional fees, contingent on the result of the litigation, is sometimes abused, and exposes the profession to misapprehension and illiberal remark, is not sufficient excuse for refusing to enforce such a contract, when characterized throughout by `all good fidelity to the client.'"
It is undoubtedly the case that Mrs. Speece was a person with certain legal rights to pursue, and, except for her real estate holdings, without means to pursue them. Obviously, respondent's compensation for his services could only come from the real estate. While respondent has characterized his fee arrangement as contingent, it must be observed that the only contingency was in the amount of services he would be required to render before his client's demise, and not in the amount of the fee which was fixed. Considering all the legal services rendered to Mrs. Speece during a three-year period prior to the appointment of a guardian over her estate, it is clear that respondent had performed services in excess of the $1,000 he received as a retainer. At the same time, if respondent had received $200,000 for those same services, we are convinced that such fee would have been clearly excessive, in violation of Canons 29 and 32. On the basis of Mrs. Speece's age and physical condition, we hold that respondent's fee agreement with Mrs. Speece, without provision for monthly billing or other periodic accounting for services rendered, was clearly excessive and in violation of Canons 29 and 32. We believe respondent's awareness of the impropriety of such an agreement is evidenced by his disavowal of ownership of the shares of stock (representing his 20% interest) at approximately the same time the guardianship proceeding was instituted by Mrs. Speece's former husband. With regard to his previous statements of ownership of such shares, made under oath, which were subsequently nullified by the filing of amended returns, we believe such conduct is also violative of Canons 29 and 32.
It must be emphasized that while the foregoing conduct of respondent was violative of certain of the Canons of Ethics, such conduct was not fraudulent or otherwise unlawful. Mrs. Speece was entirely satisfied with respondent's representation, and she was not harmed financially by a *215 transfer of shares which never in fact occurred. In censuring respondent's breach of the above Canons, we remind the bar of the arrangements here condemned.
For all the foregoing reasons, respondent is now censured by this Court and ordered to appear before this Court on the 27th day of October, 1975, at 1:00 p.m. for public reprimand.
It is further ordered that respondent shall pay the costs of this proceeding on or before the date of said reprimand.
It is further ordered that a copy of this opinion be transmitted by the clerk of this Court to each of the Lake County Bar Associations, so their membership may be informed of the matters contained herein.
GIVAN, C.J., and ARTERBURN, DE BRULER and PRENTICE, JJ., concur.
NOTES
[1] Respondent's conduct was also charged to be in violation of corresponding Disciplinary Rules of the Code of Professional Responsibility. The Code of Professional Responsibility superseded the Canons, but was not adopted by this Court until March 8, 1971. Since the actions of respondent occurred before that date, we review all charges in terms of the Canons only.