**Ric FLOYD and Sue Floyd,**
**Appellants–Defendants,**

v.

**John M. INSKEEP and Deb Inskeep,**
**Appellees–Plaintiffs.**

No. 32A05–0504–CV–212.

Court of Appeals of Indiana.

Nov. 22, 2005.

Rehearing Denied Jan. 25, 2006.

---

James M. Snyder, Macaulay & Burtch, P.C., Richmond, VA, Maureen E. Ward,

Wooden & McLaughlin LLP, Indianapolis, IN, Attorneys for Appellants.

Mark S. O'Hara, Hostetter & O'Hara, Brownsburg, IN, Attorney for Appellees.

## OPINION

BAILEY, Judge.

### Case Summary

Appellants–Defendants Ric and Sue Floyd (collectively, "Appellants") appeal the trial court's judgment quieting title in favor of Appellees–Plaintiffs John M. and Deb Inskeep (collectively, "Appellees"). We reverse.[1]

### Issue

Appellants raise two issues, which we consolidate and restate as whether the trial court's judgment quieting title in favor of Appellees, under a theory of adverse possession, is clearly erroneous because it relies upon an improper finding of fact, i.e., Finding 11, and, further, because the evidence is insufficient to establish that Appellees substantially complied with Indiana Code Section 32–21–7–1, as required by *Fraley v. Minger*, 829 N.E.2d 476, 493 (Ind.2005).

### Facts and Procedural History

This lawsuit is the result of a boundary line dispute between Appellants and Appellees regarding certain real property located between Lots 8 and 10 of the Range Wood Subdivision in Brownsburg, Indiana. The property at issue forms the northern boundary of Lot 8 and the eastern half of the southern boundary of Lot 10 (the "Property").[2]

---

1. We direct Appellants' attention to Indiana Appellate Rule 46(A)(10), which provides in part: "The brief shall include any written opinion, memorandum of decision or findings of fact and conclusions thereon relating to the issues raised on appeal."

2. The western half of the southern boundary of Lot 10 is contiguous to Lot 9 and Appellees' ownership of that parcel through adverse possession is not in dispute.

In 1981, Appellees purchased Lot 10 of the Range Wood Subdivision. Sometime later, Appellants purchased Lot 8 of the Subdivision. Pursuant to the survey plat of the Subdivision, which was recorded on March 23, 1977, a twenty-foot drainage easement lies between Lots 8 and 10, the midpoint of which serves as the lot line between the two properties. Put another way, according to the survey, the drainage easement encroaches ten feet upon the northern border of Lot 8 and ten feet upon the southeastern border of Lot 10. At the time the parties purchased the lots in question, the developer of Range Wood had installed a ten-foot drainage swale in the middle of the drainage easement.

After purchasing Lot 10, Appellees built a house upon the land and made various other landscaping improvements. In 1985, Appellees moved onto Lot 10 and began planting rows of hardwood and pine trees on the southern edge of their property. The row of pine trees, which separates Lots 8 and 10, was intended "to serve as a privacy fence." Tr. at 22. Appellees planted the seventy-nine trees at issue immediately north of the drainage swale.

In addition to planting and maintaining the trees, Appellees mowed and maintained all of the Property located north of the drainage swale as if it were part of Lot 10. Indeed, Appellees believed that the Property formed the southern border of their lot. At one point, for example, Mr. Inskeep and Mr. Floyd had a discussion about Appellees' pine trees, i.e., the natural fence, and Appellants' "brush pile," as follows:

> [Counsel:] Okay, uh you originally earlier discussed the thing about him [i.e., Mr. Floyd] saying that your trees were starting to overhang onto his property. When did that discussion occur?

> [Mr. Inskeep:] That as I recall was prior to 1998 uh 98 when the survey was done uh this brush pile one time prior to that had been uh burned uh he set it on fire and it scorched several of my pine trees and I had a discussion with him that uh, uh the trees were going to survive but I, I had asked him if he'd next time he lit the, the pile if he could make sure the wind was in the correct direction or, or maybe not let the pile get quite so big possibly before he, he burnt it so that my trees would not be damaged and that was the point where he said that my trees were starting to hang onto his property.

*Id.* at 31. In addition, Mr. Inskeep testified that, prior to 1998, Mr. Floyd never used the disputed Property.[3]

---

3. Mr. Floyd testified, however, that he would mow the Property "interdentally" or occasionally. Tr. at 51. As for Appellants' use of the Property, he also testified:

> Q Now, when your kids would go up to, you earlier testified, when your kids would go up the, the Quinn legal drain, would they not walk the swale that's shown to the eastside of your lot and, and the eastside of lot ten, going between lots seven and ten?
> A In that general vicinity yes.
> Q So actually they weren't just crossing inside Mr. Inskeep's property, they were going up along the eastside of that property?

> A Well first uh that wasn't Mr. Inskeep's property uh but they would uh obviously they would walk to get back there and they would be on our property and then whatever was there until we got to, to the drain.
> Q Okay but they, your testimony was really they went up that drain along the eastside of that swale on up through there?
> A Well I have four kids, uh two of them were sons uh they did anything. I have no idea exactly where they went but I'm sure they were back in that area. We had dogs and the dogs would go back there (inaudible).

In June of 1998, Appellants had their property, i.e., Lot 8, surveyed and discovered that their property line extended approximately thirty feet north of the drainage swale. On June 24, 1998, Mr. Floyd notified Mr. Inskeep of such survey and of Appellants' intent to place permanent markers on the Property, in an effort to facilitate future property transfers of Lot 8. In response, Appellees apparently inquired about buying the Property from Appellants.

On May 19, 2004, Appellees filed an action to quiet title against Appellants, alleging that Appellees had acquired the Property through adverse possession. After conducting a bench trial, the trial court entered judgment in favor of Appellees. In so doing, the trial court made the following, pertinent, findings of fact:

5. At the time the parties purchased the respective lots, a 10 foot drainage swale had been installed ... by the developer of Rangewood, in the area where the 10 foot drainage easement had been indicated on the plat of Rangewood. This drainage swale was clearly evidence to all, and was the only demonstrative development improvement between Lots 10 and 8 and 9. (Exhibits 2 and 3)[.]

\* \* \* \* \* \*

7. [The Inskeeps] exclusively planted many trees in uniformed, planned plantings on all the land north of the drainage swale, some of those trees being hardwood trees intended for future harvest as veneer trees, and thereafter, solely maintained those plantings, mowed and maintained all the ground north of the centerline of the swale, and ex-

Q Okay.
A So I can't tell you exactly where they went.

clusively enjoyed all that land north of the drainage swale as part of his residential yard. Said maintenance and use have continued to the present day, well over 24 years. (Exhibits 4, 5, 8, 9, 10).

\* \* \* \* \* \*

9. In June 1998, a survey was conducted by [the Floyds] which showed that the drainage swale was not the actual lot line between Lot 10 and Lot 8. The actual lot line was 30 to 35 feet north of the swale.

10. Notwithstanding this revelation, [the Inskeeps] continued to exclusively possess, maintain and claim all that area north of the drainage swale as being their property and part of Lot 10.

11. The parties have paid the taxes on the respective Lots as shown on the plat thereof, as called for by the tax duplicates they receive.

12. Over the 24 years, there had been several incidents between [the Inskeeps] and [the Floyds,] where the [Inskeeps] claimed the land to the north of the swale and the trees planted thereon, and the [Floyds] acknowledged such claim and instructed the [Inskeeps] to trim back [their] trees to keep them from overhanging on [the Floyds'] land south of the drainage swale.

13. [The Floyds] had not taken any acts at any time to defeat [the Inskeeps'] claim to and actual possession of the land south of the drainage swale.

14. The area in dispute is an area of approximately 32 feet in width along the entire north end of Lot 8

*Id.* at 52–53.

as shown on the plat for Range-wood (Exhibit 1).

Appellants' App. at Tab 2.[4]  It is from this judgment that Appellants now appeal.

## Discussion and Decision

### I.  Standard of Review

On review of claims tried without a jury, this Court will not set aside the trial court's findings and judgment unless they are clearly erroneous, and we give due regard to the court's ability to assess the credibility of the witnesses.  Ind. Trial Rule 52(A); *see also Fraley*, 829 N.E.2d at 482.  A judgment is clearly erroneous when there is "no evidence supporting the findings or the findings fail to support the judgment," and where the trial court applies the wrong legal standard to properly found facts.  *See Fraley*, 829 N.E.2d at 482 (citing *Chidester v. City of Hobart*, 631 N.E.2d 908, 910 (Ind.1994) and *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind.1997)).

While findings of fact are reviewed under the clearly erroneous standard, appellate courts do not defer to conclusions of law, which are reviewed de novo. *Fobar v. Vonderahe*, 771 N.E.2d 57, 59 (Ind.2002).  Where a case presents mixed issues of fact and law, the Indiana Supreme Court has described the review as applying an abuse of discretion standard.  *Id.* (noting that "[a]lthough this is in some sense an issue of law, it is highly fact sensitive and is subject to an abuse of

discretion standard").  Further, in the event that the trial court mischaracterizes findings as conclusions or vice versa, we will look past these labels to the substance of the judgment.  *Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind.2002), *reh'g denied.*  To determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made.  *Yanoff*, 688 N.E.2d at 1262.

### II.  Analysis

On appeal, Appellants argue that the trial court's judgment quieting title in favor of Appellees under the doctrine of adverse possession is clearly erroneous, in part, because Appellees failed to present clear and convincing evidence[5] that they substantially complied with Indiana Code Section 32–21–7–1.[6]  That statute, which is commonly referred to as the Indiana adverse possession tax statute, provides:

> In any suit to establish title to land or real estate, possession of the land or real estate is not adverse to the owner in a manner as to establish title or rights in and to the land or real estate unless the adverse possessor or claimant pays and discharges all taxes and special assessments due on the land or real estate during the period the adverse possessor or claimant claims to have possessed the land or real estate adversely.  However, this section does not relieve any adverse

---

4.  Appellants maintain that the trial court adopted, verbatim, Appellees' findings of fact and conclusions thereon, which were submitted on March 11, 2005.  Appellants have failed, however, to provide us with a copy of the March 11 submission.  Thus, to the extent that any error is alleged on that basis, we do not address such error.

5.  The *Fraley* Court held that "clear and convincing" is the "preferable way to describe the heightened standard needed to establish adverse possession."  829 N.E.2d at 483.

6.  Appellees contend that Appellants waived application of the adverse possession tax statute by failing to argue it at trial or in their appellant's brief.  We disagree.  At trial, Appellees—as the adverse claimants—bore the burden of proving that they had adversely possessed the Property in question and, pursuant to *Fraley*, compliance or substantial compliance, depending upon the circumstances, with Indiana Code Section 32–21–7–1 is an additional element of adverse possession.

possessor or claimant from proving all the elements of title by adverse possession required by law.

Ind.Code § 32–21–7–1. When Indiana Code Section 32–21–7–1, formerly codified as part of Acts 1927, Chapter 42, Section 1 at page 119, was first enacted, some legal scholars expected it to "blow[ ] the lid off the kettle" with regard to the doctrine of adverse possession. *Fraley*, 829 N.E.2d at 489 (quoting James H. Neu, *Adverse Possession in Indiana*, 16 Notre Dame Lawyer 216, 219 (1941)).

In the first twenty-four years after it was enacted, however, the Indiana Supreme Court did not cite to or rely upon the adverse possession tax statute in seven decisions involving adverse possession. *See Fraley*, 829 N.E.2d at 489 (citing *Hare v. Chisman*, 230 Ind. 333, 340–41, 101 N.E.2d 268, 271 (1951) (noting that the adverse claimant had paid property taxes but finding evidence insufficient to establish adverse possession); *Elkhart v. Christiana Hydraulics, Inc.*, 223 Ind. 242, 259, 59 N.E.2d 353, 359 (1945) (referring to adverse possession only summarily); *Draper v. Zebec*, 219 Ind. 362, 372, 37 N.E.2d 952, 956 (1941) (referring to adverse possession only summarily), *overruled on other grounds by O'Donnell v. Krneta*, 238 Ind. 582, 598, 154 N.E.2d 45, 52 (1958); *Ft. Wayne Smelting & Refining Works v. Ft. Wayne*, 214 Ind. 454, 459, 464, 14 N.E.2d 556, 559, 560–61 (1938) (summarizing findings that adverse claimant and predecessors paid property taxes but affirming judgment for adverse possession without mention of tax statute); *Marengo Cave Co. v. Ross*, 212 Ind. 624, 628, 10 N.E.2d 917, 919 (1937) (noting adverse claimant paid property taxes, but finding evidence insufficient to establish adverse possession); *Geiger v. Uhl*, 204 Ind. 135, 180 N.E. 10 (1932) (finding adverse possession established but without mention of tax statute among elements); *and Hitt v. Carr*, 201 Ind. 17, 162 N.E. 409

(1928) (again, finding adverse possession established, without mentioning of tax statute among elements)).

In 1955, the Indiana Supreme Court eventually analyzed the adverse possession tax statute and concluded that it was inapplicable. *See Echterling v. Kalvaitis*, 235 Ind. 141, 146–47, 126 N.E.2d 573, 575 (1955). In so doing, the *Echterling* Court held:

> [W]here continuous, open, and notorious adverse possession of real estate has been established for twenty years to a contiguous and adjoining strip of land such as that here in question, and where taxes have been paid according to the tax duplicate, although said duplicate did not expressly include that strip, adverse possession is established to that strip even though the taxes were not paid by the adverse claimant.

*Id.* The Court reasoned that "complete legal descriptions of real estate are not present on the tax duplicates issued by county or city treasurers" and that, instead, they are "usually sketchy and inaccurate." *Id.* The *Echterling* Court provided the following illustration regarding application of the tax statute:

> An example might be where one has record title to Lot No. 1 and has erected a building on that lot, which, twenty years later, is found by some surveyor to be one foot over on an adjoining lot, No. 2—the fact that the owner of Lot No. 1 was assessed for improvements (the building) and real estate (Lot No. 1) would be sufficient to comply with the statute as to payment of taxes.

*Id.* at 147, 126 N.E.2d at 575–76.

▮▮▮▮ Recently, in *Fraley*, the Court reexamined its holding in *Echterling* and held:

> *Echterling* permits substantial compliance to satisfy the requirement of the adverse possession tax statute in boundary disputes where the adverse claimant

has a reasonable and good faith belief that the claimant is paying the taxes during the period of adverse possession. But we decline to extend Echterling to permit total disregard of the statutory tax payment requirement merely on grounds that the legal title holder has other clear notice of adverse possession. 829 N.E.2d at 493. The *Fraley* Court also synthesized and rephrased the elements of adverse possession. *Id.* at 486. Thus, to prevail on a claim of adverse possession, in the wake of *Fraley*, a claimant must establish the following four elements: (1) control;[7] (2) intent;[8] (3) notice;[9] and (4) duration.[10] In addition, in boundary disputes, adverse claimants must demonstrate that they substantially complied with Indiana Code Section 32–21–7–1.

In the present case, the trial court found, as Finding 11, "[t]he parties have paid the taxes on the respective Lots as shown on the plat thereof, as called for by the tax duplicates they receive." Appellants' App. at Tab 2. However, after thoroughly reviewing the record, we have found *no testimony or other evidence* to support this finding. We see no evidence, for example, that Appellees paid taxes on their land adjoining the disputed tract, or

that Appellees paid, intended to pay, or believed that they were paying the taxes on the disputed tract. Furthermore, there is no evidence that, during the period of adverse possession, Appellees "[paid] and [discharged] all taxes and special assessments due on the land or real estate," as required by the adverse possession tax statute, nor is there any support for a finding of substantial compliance. Because of this dearth of evidence regarding Appellees' payment of taxes, a reasonable trier of fact could not correctly conclude that substantial compliance with Indiana Code Section 32–21–7–1 was established, let alone by clear and convincing evidence.[11] *See, e.g., Fraley*, 829 N.E.2d at 493.

For the foregoing reasons, we reverse the trial court's judgment quieting title in favor of Appellees.

Reversed.

SHARPNACK, J., and DARDEN, J., concur.

7.  To establish control, the adverse claimant must have exercised a degree of use and control over the parcel that is normal and customary considering the characteristics of the land in question. *Fraley*, 829 N.E.2d at 486 (recognizing that the control element reflects the former elements of "actual," and in some ways "exclusive," possession).

8.  To demonstrate intent, the claimant must have shown his or her intent to claim full ownership of the tract superior to the rights of all others, particularly the legal owner. *Fraley*, 829 N.E.2d at 486 (reflecting the former elements of "claim of right," "exclusive," "hostile," and "adverse").

9.  For notice, the claimant's actions with respect to the land must have been sufficient to give actual or constructive notice to the legal

owner of the claimant's intent and exclusive control. *Fraley*, 829 N.E.2d at 486 (reflecting the former "visible," "open," "notorious," and in some ways the "hostile," elements).

10.  To show duration, the claimant must have satisfied each of the other elements continuously for the required period of time, i.e., ten years. *Fraley*, 829 N.E.2d at 486 (reflecting the former "continuous" element).

11.  Appellants also contend that the trial court's judgment is clearly erroneous because Appellees failed to establish any of the elements of adverse possession and, further, that Findings 5, 7, 10, 12, 13, and 14 are clearly erroneous. However, because we find Appellees' failure to show substantial compliance with the tax statute dispositive, we do not address these claims of error.