**In the Matter of the GUARDIANSHIP OF E.N., Adult.**

No. 88A01–0508–CV–338.

Court of Appeals of Indiana.

Aug. 25, 2006.

Rehearing Denied Nov. 1, 2006.

Matthew Jon McGovern, Evansville, IN, Attorney for Appellant.

David P. Allen, Allen Allen & Allen, Salem, IN, Attorney for Appellee.

## OPINION

FRIEDLANDER, Judge.

E.N. was an elderly man whose deteriorating mental condition required the appointment of a guardian. His children, Shirley and Marvin Nolan (collectively, "the Children" unless otherwise specified), were appointed co-guardians. Even before those appointments and certainly ever since, a series of disputes arose between the Children and E.N.'s brothers, William Nolan and Arville Nolan (collectively, "the Brothers" unless otherwise indicated) about E.N.'s property and care. In this lawsuit, the Brothers appeal the trial court's approval of an estate plan filed by the Children in their capacity as E.N.'s co-guardians. The Brothers challenge the estate plan in two respects. As restated, the issues are as follows:

1. Did the trial court have statutory authority to approve an estate plan that transferred all of E.N.'s assets into a trust and rendered his will meaningless?

2. Did the findings of fact and conclusions of law support the trial court's ruling?

We affirm.

The facts favorable to the judgment are that on December 10, 1997, Donna Nolan, E.N.'s wife of more than forty-two years, filed for dissolution. E.N. left the marital residence and eventually moved into the Brothers' home. Meanwhile, his relationship with the Children deteriorated to the point that they were virtually estranged from one another. The dissolution was final on February 4, 1999. On February 22, 1999, E.N. executed a will divesting his ex-wife and children of any inheritance and leaving his entire estate to the Brothers. Shirley would later file "Prior Objections to Probate", objecting to that will. *Appellant's Appendix* at 11. At or about that time, and perhaps before, E.N.'s mental faculties began to deteriorate precipitously. In June 1999, Shirley petitioned for appointment of a guardian because E.N. was suffering from dementia, and she was appointed E.N.'s guardian. On November 26, 2002, Marvin was appointed co-guardian.

We pause here to review the subject of E.N.'s wills. E.N. had made several wills over the years. In 1983, E.N. prepared a will naming Donna, the Children, and his grandchildren as beneficiaries.[1] In 1992, E.N. and Donna executed a revocable trust that benefited each of them and their children. On December 23, 1997, after Donna had petitioned for dissolution, E.N. executed a will naming William and Arville as beneficiaries and specifically disinheriting his children. As indicated above, on February 22, 1999, E.N. executed another will to the same effect as the December 23, 1997 will. On November 24, 1999, however, E.N. executed what was to be his final will, naming the Children as the sole beneficiaries of his estate.[2]

---

1. The exhibit evidencing this will was an unsigned copy of the will. At the hearing, the Children's attorney indicated he would testify that E.N. executed the will. It does not appear that such testimony was offered.

2. This will was prepared by the same attorney who has represented the Children throughout these proceedings.

We come now to the subject matter of this appeal. On July 15, 2002, Shirley, acting as E.N.'s guardian, petitioned to execute an estate plan on E.N.'s behalf. On January 3, 2003, she filed an amended petition to execute an estate plan. That petition requested that the Children be permitted to execute the "[E.N.] REVOCABLE TRUST AGREEMENT" ("the Agreement"). *Appellant's Appendix* at 23. Pursuant to the Agreement, E.N.'s real property and personal property would be transferred to the "[E.N.] REVOCABLE TRUST." *Id.* Under the terms of the Agreement, Marvin would be the trustee and E.N. the trustor. Upon E.N.'s death, all remaining property was to be allocated to the Family Trust and the Children would essentially each receive a lifetime interest in one-half of the property in the Family Trust, with the remainder going to the Children's children, i.e., E.N.'s grandchildren. *Id.* at 25.

The Agreement specifically provided, "the Trustee shall administer the trust principal and any net income" as follows:

A. The trustee shall distribute to Trustor, or apply for the benefit of Trustor, such amounts of net income and principal even to the extent of exhausting principal, as the trustee believes desirable from time to time for his health, support and reasonable comfort, best interest, and welfare considering all circumstances and factors deemed pertinent by the trustee.

. . .

B. In addition, the trustee shall distribute to Trustor or others such amounts of net income and principal as Trustor may from time to time direct in writing, except that if the trustee believes that Trustor is unable to manage his business affairs properly because of advanced age, illness, or other cause, the trustee may, in the trustee's sole discretion, decide not to honor that Trustor's written direction.

*Id.* at 23. Thus, the Agreement called for all of E.N.'s assets to be transferred to a trust, of which Marvin was to act as trustee. Upon E.N.'s death, a new trust would be created with what remained of the original trust, with the Children and their children to be the beneficiaries. E.N.'s guardianship proceedings have generated a great deal of litigation between his brothers and his children, and the filing of the proposed estate plan spawned yet more litigation, as the Brothers objected to the petition to execute an estate plan.

On July 16, 2003, the trial court held a hearing on the petition to execute an estate plan and almost three months later it granted the petition. In granting the petition, the trial court determined that E.N. "was not competent to make his Wills." *Id.* at 207. The trial court concluded, "A reasonable and prudent person would provide the bulk of his estate to his children upon their demonstration of love, concern and care for him, while providing a reasonable allowance to his brothers who assisted him and are now in their retirement years as well." *Id.* at 209. The trial court approved the estate plan, subject to one amendment. The estate plan, as adopted by the trial court, provided in part:

J1. Shirely Nolan and Marvin Nolan, as Co–Guardians of [E.N.], may after 30 days, make Shirley Nolan and Marvin Nolan equal survivor beneficiaries of:

a. the two (2) life insurance polices with the Veterans Administration,

b. the Hartford annuity,

c. Met Life annuity.

J2. Shirley Nolan and Marvin Nolan, as Co-guardians of [E.N.], are now granted authority to change the ownership of all guardianship assets, real and personal, to the [E.N.] revocable trust

Agreement, except as set out in Judgment Paragraph # 3.

J3. The guardians' plan to transfer assets into the trust will be approved; however the trust must be rewritten to provide that five percent (5%) of the net remainder at [E.N.]'s death, after payment of final expenses, shall pass to each of the ward's brothers, William and Arville Nolan, if they survive [E.N.]. Also, if either William or Arville Nolan should file or prosecute any further legal action of any kind which depletes the guardianship assets or estate, that shall reduce the share awarded to William and/or Arville Nolan by the amount required to defend against their litigation.

*Id.*

The Brothers filed a motion to correct error, which was denied. On April 28, 2004, they filed their notice of appeal. That appeal was later dismissed without prejudice. E.N. died on May 7, 2004, and on that same day, the Children petitioned to probate E.N.'s November 24, 1999 will. On July 30, 2005, the Brothers filed another notice of appeal. It appears that the probate proceedings have been stayed pending the outcome of this appeal.

The Brothers contend the trial court was without statutory authority to adopt an estate plan that transferred all of E.N.'s assets into a trust, and effectively rewrote his will. The Children acknowledge that by approving the estate plan, the trial court "essentially made the wills meaningless by leaving no assets to be disposed of by will . . . ." *Appellees' Brief* at 7. The Children contend Ind.Code Ann. § 29-3-9-4 (West, PREMISE through 2006 Public Laws approved and effective through March 15, 2006) "essentially creates a plenary right for the guardian to take any action for the best interests of the protected person, or his or her property, spouse, or family, if the court ap-

proves." *Appellees' Brief* at 5. Further, "[u]nder the plain language of the statute in (a)(1), unless the judge abuses his discretion, it does not appear that anything is unauthorized provided it is in the best interests of the ward." *Id.* Finally, they note that the trial court determined it was in "the best interests of the ward, his property, and his family, to not go through the continued and dragged out litigation in will contest proceedings, after the death of [E.N.]." *Id.* at 9 (internal citation omitted). This dispute essentially boils down to this question: May a trial court approve an estate plan submitted by a guardian for an incompetent adult if that plan, in effect, nullifies a will executed previously by the ward? The Brothers claim courts are prohibited by statute, specifically by I.C. § 29-3-9-4, from doing so. We begin there.

I.C. § 29-3-9-4 provides:

(a) Upon petition of the guardian (other than a temporary guardian) or any other person as approved by the court, and after notice to such persons as the court may direct, the court may, after hearing and by order, authorize the guardian to apply or dispose of the principal or income of the estate of the protected person that the court determines to be in excess of that likely to be required for the protected person's future support or for the future support of the protected person's dependents during the lifetime of the protected person, in order to carry out the estate planning that the court determines to be appropriate for the purposes of minimizing current and prospective income, estate, or other taxes. The court may accordingly authorize the guardian to make gifts, outright or in trust, on behalf of the protected person to or for the benefit of the prospective legatees, devisees, or heirs, including any person serving as the protected per-

son's guardian, or to other individuals or charities, to whom or in which it is shown that the protected person had an interest. In addition, the court may also authorize the guardian to:

(1) apply or dispose of the excess principal or income for any other purpose the court decides is in the best interests of the protected person or the protected person's property, spouse, or family;

(2) exercise or waive the right of the protected person to renounce or disclaim any interest in whole or in part devolving by testate or intestate succession or by inter vivos transfer, including the right of the protected person to surrender the right to revoke a revocable trust; or

(3) exercise or release any power of appointment that is vested in the protected person.

(b) In a hearing upon a petition filed under subsection (a), the court shall determine whether the planned disposition, renunciation, disclaimer, release, or exercise is consistent with the apparent intention of the protected person, which determination shall be made on the basis of evidence as to the declarations, practices, or conduct of the protected person or, in the absence of that type of evidence, upon the court's determination as to what a reasonable and prudent person would do under the same or similar circumstances as are shown by the evidence presented to the court.

(c) The guardian may examine the will of the protected person.

◼ The first step in statutory interpretation is to determine whether the legislature has spoken clearly and unambiguously on the point in question. *Turley v. Hyten*, 772 N.E.2d 993 (Ind.2002). " 'When a statute is clear and unambiguous, we need not apply any rules of construction other than to require that words and phrases be taken in their plain, ordinary, and usual sense. Clear and unambiguous statutory meaning leaves no room for judicial construction.' " *Poehlman v. Feferman*, 717 N.E.2d 578, 581 (Ind.1999). "We will not read into a statute that which is not the manifest intent of the legislature." *Robinson v. Gazvoda*, 783 N.E.2d 1245, 1250 (Ind.Ct.App.2003), *trans. denied*. For this reason, it is as important to recognize what a statute does not say as what it does say. *Clifft v. Ind. Dep't of State Revenue*, 660 N.E.2d 310 (Ind.1995). "We are guided by the principle that the best evidence of the legislature's intent is the language found in the statute itself." *Robinson v. Gazvoda*, 783 N.E.2d at 1250.

◼ The Brothers would have us interpret I.C. § 29–3–9–4 to categorically forbid two related outcomes. First, they contend that, under the statute, the court may authorize a plan that involves only the amount exceeding that likely to be required for the protected person's future support. This requires, at a minimum, proof establishing the amount that will be required for future support, and thereby also establishing the assets exceeding that amount. Second, and somewhat related to the first, they contend I.C. § 29–3–9–4 does not permit a trial court to approve a plan that authorizes application or disposal of *all* of a protected person's assets into a trust. These interpretations of the statute stem, we think, from placing too much emphasis on one phrase in subsection (a) of the statute. The phrase in question permits the court to "authorize the guardian to apply or dispose of the principal or income of the estate of the protected person that the court determines to be in excess of that likely to be required for the protected person's future support or for the future support of the protected person's dependents[.]" I.C. § 29–3–9–4. If

we were to focus only upon this phrase, the Brother's construction becomes plausible, perhaps even preferable. We cannot, however, determine its meaning without also considering the context in which it appears.

We examine statutes as a whole. *City of North Vernon v. Jennings Nw. Reg'l Utils.*, 829 N.E.2d 1 (Ind.2005). Words and phrases in a statute cannot be considered in isolation, standing apart from the remainder of the statute of which they are a part. *Jackson v. City of Jeffersonville*, 771 N.E.2d 703 (Ind.Ct.App.2002), *trans. denied.* When interpreting the words of a single portion of a statutory provision, we do so with due regard for all of the other sections of that act, and also with regard for the legislative intent, with the ultimate goal of carrying out the spirit and purpose of the act. *AlliedSignal, Inc. v. Ott*, 785 N.E.2d 1068 (Ind.2003); *City of North Vernon v. Jennings Nw. Reg'l Utils.*, 829 N.E.2d 1.

I.C. § 29–3–9–4 appears to classify the protected person's assets as generally fitting within one of two categories. The first category consists of assets that will be required to satisfy the protected person's needs, as well as the needs of the protected person's dependents during the protected person's lifetime. The second category consists of assets in excess of those fitting within the first category. Reduced to its simplest terms, the statute (1) requires that the protected person's assets *must* be used to support the protected person and the protected person's dependents during the protected person's lifetime, and (2) outlines the permissible disposition of assets that exceed that amount. But, there is no question that (1) above is the statute's primary, overarching goal.

The foregoing indicates that the trial court must determine what amount will be required to provide for the protected person's present and future financial needs, as well as those of any of the protected person's dependents. This is not to say, however, that the court must necessarily calculate and enter detailed findings reflecting specific amounts. The trial court is not required to enter such findings merely for the sake of entering them, i.e., it is not merely a pro forma checklist item to be marked off in the process of managing a protected person's assets. It is instead a legislative directive identifying a court's highest priority in assessing proposals submitted by guardians concerning the use and disposition of a protected person's assets: first and foremost, make sure the protected person and his or her dependents are cared for.

With these principles in mind, we turn to the facts of this case. The trial court approved the placement of all or nearly all of E.N.'s assets into a trust. The court found that those assets, including a duplex owned by E.N., all of E.N.'s insurance policies, his checking account, his investment account, his truck, cemetery lots, and all of his personal property, totaled $524,701.87 in 1999. Although the court acknowledged that the parties had "presented insufficient evidence to make a determination of any sums of money in possession of the guardian that would be 'in excess of that likely to be required for the protected person's future support' … pursuant to I.C. § 29–3–99–4[sic]," it also found that, "most of the assets of [E.N.] would be available for his support through a transfer of assets into the proposed trust." Indeed, according to the trust terms, Marvin must distribute or apply for the benefit of E.N., "such amounts of net income and principal, even to the extent of exhausting principal, as the trustee believes desirable from time to time for his health, support in reasonable comfort, best interest, and welfare." *Appellant's Ap-*

*pendix* at 23. Further, the trust instrument provided that undistributed net income of the trust would be accumulated and added to the principal.

The plan approved by the trial court complied with I.C. § 29–3–9–4's dictate that the protected person's assets be used first and foremost for the care and support of the protected person. All or virtually all of E.N.'s assets were placed in a trust, and the trust funds could be spent during E.N.'s lifetime only for his benefit, in his best interest, and for his welfare. Under these circumstances, it does not matter that the trial court was unable to determine with specificity an amount that would be necessary for E.N.'s support. Even with such information, no plan could have been placed before the court that would have been more effective in accomplishing the overarching goal of I.C. § 29–3–9–4 because under the plan, *all* of E.N.'s assets were dedicated to that use during his lifetime. We can certainly envision scenarios in which the failure to determine a specific amount that will be necessary for the protected person's support would render erroneous an order approving a plan. This is not such a case, however.

The Brothers also argue that the plan approved by the court is erroneous because it placed *all* of E.N.'s assets in the trust. We need not tarry long on this question. Simply put, the restriction that the Brothers ask us to read into I.C. § 29–3–9–4 cannot be found anywhere in the text of that provision. If the legislature had wished to engraft such a limitation into the statute, it could easily have done so. It chose not to, and we decline the request to amend the statute in that regard. The same can be said with respect to the Brothers' argument that the court's action was erroneous because the plan it approved effectively re-wrote E.N.'s will. Leaving aside the significant question of which of E.N.'s wills would be valid, we can find no restriction in the statute to the effect that the court may not adopt a plan that effectively rewrites or supercedes a will. Again, the power conferred under the statute is broadly worded. It authorizes the court to approve a plan that provides for the protected person's care, and to dispose of the remaining assets in a way that is consistent with the protected person's best interest. The statute says nothing, however, about the court's discretion being bounded by the provisions of the protected person's will, if indeed there is one.

In summary, the sole over-arching restriction set out in the statute is that a plan to dispose of a protected person's assets should be approved only if it provides, to the greatest extent possible, support for the protected person during that person's lifetime. The protected person's property exceeding that amount may be disposed of so long as the disposition is "in the best interests of the protected person or the protected person's property, spouse, or family[,]" I.C. § 29–3–9–4(a)(1). Also, the court should consider whether the planned disposition "is consistent with the apparent intention of the protected person" as expressed in the protected person's declarations, practices, or conduct of the protected person. I.C. § 29–3–9–4(b). Lacking such evidence, the court may consider after determining "what a reasonable and prudent person would do under the same or similar circumstances". *Id.* Finally, we observe that a guardian may dispose of a protected person's excess assets, but in doing so must act in accordance with the protected person's best interests, as determined by the court. Thus, for instance, a guardian may or may not adopt an estate plan that effectively rewrites the protected person's will, depending on whether that course of action is deemed by the court to be in the protected

person's best interest. Also, for instance, a court may or may not approve a transfer of all of the protected person's assets into a trust, again depending on which is in the best interest of the protected person. These are just two examples of the latitude conferred upon the court by I.C. § 29–3–9–4.

Finally, we observe it may well be that, on the facts of a particular case, the court should not approve a transfer of all of the protected person's assets into a trust, or that the court should not adopt an estate plan that effectively rewrites the protected person's will. Such decisions should not be made because those actions are per se forbidden under the statute, but instead because they would not provide for the protected person's support, or because they would not be in *that* protected person's best interest.

2.

■■■ The Brothers contend the court's findings and conclusion do not support its judgment. The Brothers challenge numerous findings in this regard. Generally, the challenged findings involve the questions of E.N.'s competence while he lived with the Brothers, and thus his ability to execute a valid will during that time, and whether the Brothers attempted to influence E.N. The challenged conclusions are that (1) E.N. would have wanted his children to inherit the bulk of his estate, and (2) in view of the conclusion that the evidence did not permit the court to determine what amount, if any, of E.N.'s assets exceeded his needs, the court could not approve the plan.

■■■ We review findings of fact under the clearly erroneous standard. *Fraley v. Minger*, 829 N.E.2d 476 (Ind.2005). In so doing, we give "due regard" to the trial court's superior vantage point to assess witness credibility. Ind. Trial Rule 52(A). A judgment is clearly erroneous

when there is " 'no evidence supporting the findings or the findings fail to support the judgment,' " and where the trial court applies the wrong legal standard to properly found facts. *Floyd v. Inskeep*, 837 N.E.2d 569, 573 (Ind.Ct.App.2005) (quoting *Fraley v. Minger*, 829 N.E.2d at 482), *trans. denied.* A finding or conclusion is clearly erroneous if it leaves us with the firm conviction that a mistake has been made. *Fraley v. Minger*, 829 N.E.2d 476. We review conclusions of law under the de novo standard. *Id.*

With respect to the argument about E.N.'s capacity to execute a valid will, the Brothers present this claim as a foundation for their ultimate claim that E.N.'s estate should be distributed pursuant to the terms of either the December 23, 1997 will or the February 22, 1999 will, both of which were executed while E.N. lived with the Brothers and both of which left the bulk of E.N.'s estate to the Brothers. Our conclusions elsewhere in this opinion render this issue moot. That is, we have concluded that the estate plan and the trust fund created thereby, which effectively supplants any will made by E.N., is valid. Therefore, we need not decide whether E.N. was of testamentary capacity, or whether the brothers exerted undue influence, as the validity of any of E.N.'s wills is of no consequence.

This brings us finally to the findings that support the trial court's decision to approve the estate plan. As indicated earlier, I.C. § 29–3–9–4 authorizes a guardian, after devising a plan that will provide for the protected person's needs, to make gifts to the protected person's prospective legatees, devisees, or heirs, or any other individuals in whom the protected person had an interest. In addition, the court may apply the excess principal or income for any other purpose the court decides is in the best interests of the protected person

or of the protected person's property, spouse, or family.

The trial court approved the placement of all of E.N.'s assets into a trust. Under the terms of that trust, E.N.'s financial needs would be taken care of, and nearly all of the assets remaining in the trust at E.N.'s death would pass to his children. The evidence concerning his relationship with his children was conflicting, but there certainly was evidence to support a conclusion that those once-difficult relationships were repaired at the time of E.N.'s death. We say "nearly all of the assets" because the trial court determined that the trust should be modified to include a distribution of five percent of the net remainder to William and Arville. That seems fair and appropriate on the facts of this case, is consistent with the guidelines set out in I.C. § 29–3–9–4, and certainly is within the bounds of what a reasonable person would do in the same or similar circumstances. For these reasons, we affirm the trial court in all respects.

Judgment affirmed.

MATHIAS, J., concurs.

BARNES, J., dissents with separate opinion.

BARNES, Judge, dissenting with separate opinion.

I respectfully dissent. Although Judge Friedlander's majority opinion is thoughtful and "solves" the long-standing dispute between the Brothers and the Children, the evidence indicates to me that the last will made while E.N. was competent left his estate to the Brothers and that today's decision is in conflict with that intention.

Assuming that the trial court had the statutory authority to approve an estate plan transferring all of E.N.'s assets into a trust, I am not convinced that the approval of an estate plan in which the Children and the Children's children are the primary beneficiaries upon E.N.'s death "is consistent with the apparent intention of the protected person." Ind.Code § 29–3–9–4(b). E.N. executed several wills during his lifetime. In the wills executed in December 1997 and February 1999, E.N. named the Brothers as his sole beneficiaries. The trial court found that the testimony indicated that E.N. "intended in 1998 and 1999 to disinherit his children as evidenced by the two Last Wills executed prior to and subsequent to his divorce action...." Appellants' Br. p. j. The trial court also found that no evidence was presented that E.N. was incapacitated in December 1997 and that Shirley testified "that she had no reason to believe that in 1996 or 1997 there was anything mentally wrong with her father." *Id.* at d.

In November 1999, E.N. executed a will in which he left everything to the Children. However the trial court found, based on Shirley's testimony, that E.N.'s mental condition had deteriorated since June of 1999. *See* Appellants' Br. p. d. More specifically, the trial court found, "In June 1999, [E.N.] was suffering from dementia and was unable to care for himself or his affairs." *Id.* at e.

Despite finding that E.N. was not incapacitated when he drafted the 1997 will, the trial court concluded:

C10. There has been testimony that [E.N.], while in a weakened and vulnerable condition, was susceptible to the influence of those who are now in a legal position to benefit from this death, including his brothers William and Arville Nolan and his children Marvin and Shirley Nolan.

[E.N.] was not competent to make his Wills. Because of his diminished mental condition, he lacked the capacity in each case to look beyond the kindness of

those who were providing for his physical and emotional needs during each period.

*Id.* at m.

Because of the extreme disparities in E.N.'s wishes and the decline of his mental capacity toward the end of his life, I believe it is unwise to completely disregard the intentions clearly indicated in E.N.'s 1997 will, as this will appears to have been made while E.N. was competent. I am troubled, to say the least, that the Children who were specifically disinherited in this will, were subsequently permitted to effectively rewrite E.N.'s will to their benefit. Although Indiana Code Section 29–3–9–4 certainly permits the creation of estate plans in some situations, I am hesitant to allow the statute to be used to override an estate plan or will created by the protected person before the guardianship proceedings were initiated. Because the statute only permits, and does not require, the authorization of a guardian's plan, I believe this dispute is better resolved in a probate proceeding.[3]

---

**3.** I also do not believe that this is a situation in which the trial court was free to determine what a reasonable and prudent person would do under similar circumstances because there is not an absence of evidence as to the declarations, practices, or conduct of the protected person. *See* I.C. § 29–3–9–4(b).